IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 122,163

STATE OF KANSAS,
*Appellee*,

v.

JEFF HILLARD,
*Appellant.*

SYLLABUS BY THE COURT

1.

When reviewing a district court's ruling on a motion to suppress, this court applies a bifurcated standard of review—the district court's factual findings are reviewed for substantial competent evidence and the district court's legal conclusions are reviewed de novo. When material facts underlying defendant's claim are not disputed, the issue is a question of law over which an appellate court has unlimited review.

2.

The Fourth Amendment to the United States Constitution imposes several requirements on searches and seizures performed by law enforcement. Law enforcement must conduct searches and seizures pursuant to a warrant. Warrantless searches and seizures, including warrantless entries into private dwellings, are per se unreasonable unless they fall within a recognized exception to the warrant requirement. The warrant authorizing a search must also be supported by probable cause. The warrant's language must also be sufficiently particular that law enforcement can reasonably locate the place to be searched and identify the items authorized to be seized. And if the scope of a search

1

exceeds that authorized by a valid warrant, the subsequent seizure is unconstitutional without more.

3.

The State bears the burden of proving that a search and seizure was lawful under the Fourth Amendment. If the State cannot meet this burden, the suppression of the unlawfully obtained evidence may be warranted under the exclusionary rule. The exclusionary rule is a judicially created rule that safeguards against unconstitutional searches and seizures by suppressing illegally seized evidence as a deterrent to future violations. But the exclusionary rule is not absolute, and courts have recognized exceptions to the rule when its purpose would not be served by the suppression of evidence.

4.

Under the emergency aid exception to the Fourth Amendment's warrant requirement, warrantless entry into a home is permissible when law enforcement officers enter the premises with an objectively reasonable basis to believe someone inside is seriously injured or imminently threatened with serious injury, and the manner and scope of any ensuing search is reasonable. In determining if the emergency aid exception applies, courts consider whether the totality of the circumstances created a reasonable belief that someone within the premises to be searched may need immediate aid. Reasonable belief does not require absolute certainty, and the standard is more lenient than the probable cause standard.

5.

In deciding whether an affidavit provides probable cause for a search warrant, a judge considers the totality of the circumstances presented and makes a practical, common-sense decision whether a crime has been or is being committed, and whether

there is a fair probability that contraband or evidence of a crime will be found in a particular place. In making a probable cause determination, judges may draw reasonable inferences from the information in the supporting affidavit and practical considerations of everyday life to determine the likelihood that evidence of a crime will be found in a particular place.

6.

When an affidavit supporting a search warrant is challenged, the task of the reviewing court is to ensure that the issuing judge had a substantial basis for concluding probable cause existed.

7.

The inevitable discovery doctrine is an exception to the exclusionary rule that allows for the admission of illegally obtained evidence if that evidence would have been discovered through lawful means.

8.

Generally, appellate courts do not consider constitutional claims raised for the first time on appeal. There are several recognized exceptions to this general rule, including: when the claim involves only a question of law arising on proved or admitted facts and is determinative of the case; consideration of the claim is necessary to serve the ends of justice or prevent the denial of fundamental rights; or the district court is right for the wrong reason. Even when an exception applies, the decision to hear that claim for the first time on appeal is still within the discretion of the appellate court.

9.

Failure to support a point with pertinent authority or show why it is sound despite a lack of supporting authority is akin to failing to brief the issue.

10.

A party offering an object into evidence must show with reasonable certainty that the object has not been materially altered since the object was taken into custody. The test for chain of custody is whether there is a reasonable certainty that the object has not been materially altered. Any deficiency in the chain of custody goes to the weight of the evidence rather than its admissibility. A district judge's determination of whether there is a reasonable certainty that a piece of evidence has not been materially altered is reviewed for abuse of discretion.

11.

A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. The party asserting the district court abused its discretion bears the burden of showing such abuse of discretion.

12.

The determination of whether evidentiary foundation requirements for the admission of evidence have been met is left largely to the discretion of the district court.

13.

To lay an adequate foundation for an enhanced audio recording, the State need not establish how the recording was enhanced at a technical level. The State need only demonstrate the recording is accurate and was enhanced to make its content easier for the jury to understand.

14.

District courts have wide discretion in determining whether to permit the jury to use written transcripts as aids in listening to audiotape recordings. The use of a transcript to aid in the understanding of an audio or videotape has been allowed where (1) the audiotaped conversation is difficult to understand; (2) the transcript accurately reflects the conversation; (3) inaudible portions of the audiotaped conversation are recorded as "inaudible" on the transcript; (4) the trial court instructs the jury that the transcript is not evidence and that the evidence is the audio recording itself; (5) the jury is not allowed to take the transcript with it into the jury room for deliberations; and (6) the transcript aids the jury in understanding the audiotaped conversation.

15.

To satisfy the Fourth Amendment's particularity requirement, a search warrant must describe the premises to be searched with sufficient particularity to permit the executing officer to locate the same from the face of the warrant. Courts interpret warrants in a common-sense, rather than a hyper-technical, fashion.

16.

Appellate courts review jury instruction issues under a four-step process: (1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court uses an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court determines whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, using the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011).

17.

While this court has strongly recommended the use of pattern jury instructions, district courts need not use those instructions without alteration. If the particular facts in a case require modification of the applicable pattern instruction or adding some instruction not included in PIK, the trial court should make such modification or addition. Without that need, PIK instructions and recommendations should be followed.

18.

Kansas courts treat venue as a jurisdictional matter in criminal cases. Venue must be proved to establish the jurisdiction of the court; it is a question of fact to be determined by the jury, albeit the existence of jurisdiction is a question of law, subject to unlimited appellate review.

19.

Under K.S.A. 22-2602, except as otherwise provided by law, the prosecution must be in the county where the crime was committed. But under K.S.A. 22-2608, if a crime is committed in, on, or against any vehicle or means of conveyance passing through or above the state of Kansas, and it cannot readily be determined in which county the crime was committed, the prosecution may be in any county in Kansas through or above which such vehicle or means of conveyance has passed or in which such travel commenced or terminated. And under K.S.A. 22-2603, where two or more acts are requisite to the commission of any crime and such acts occur in different counties the prosecution may be in any county in which any of such acts occur.

20.

The Sixth Amendment to the United States Constitution grants the accused a right to confront the witnesses against him or her. A criminal defendant's right of cross-examination is part of the Sixth Amendment's right of confrontation. But a defendant's

right of cross-examination is not absolute, and in certain circumstances, it must bow to accommodate other legitimate interests in the criminal trial process.

21.

When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence and reasonable inferences from such evidence in a light most favorable to the prosecution, the appellate court is convinced a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.

22.

Premeditation means to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act. Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life.

23.

Premeditation and deliberation may be inferred from the established circumstances of the case, provided the inference is a reasonable one. Several factors may be considered when determining whether the evidence gives rise to an inference of premeditation, including (1) the nature of the weapon used; (2) lack of provocation; (3) the defendant's conduct before and after the killing; (4) threats and declarations of the defendant before and during the occurrence; and (5) the dealing of lethal blows after the deceased was felled and rendered helpless. Additionally, the analysis of what inferences can be reasonably drawn is not driven by the number of factors present in a particular case because in some cases one factor alone may be compelling evidence of premeditation.

Appeal from Sedgwick District Court; BRUCE C. BROWN, judge. Opinion filed June 10, 2022. Convictions affirmed in part and reversed in part, and sentence vacated in part.

*Wendie C. Miller*, of Kechi, argued the cause and was on the briefs for appellant.

*Lance J. Gillett*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

WALL, J.:  A jury convicted Jeff Hillard of a half dozen offenses—including first-degree premeditated murder—in connection with the kidnapping, torture, and killing of Scottie Goodpaster Jr., and the kidnapping and rape of Goodpaster's girlfriend, S.S. Hillard committed these offenses with several codefendants, including his wife Heidi Hillard, with whom he was jointly tried. See *State v. Hillard*, 313 Kan. 830, 491 P.3d 1223 (2021).

In his direct appeal, Hillard claims many errors occurred over the course of his prosecution. In the end, we agree with Hillard, and the State concedes, that the evidence was insufficient to support his conviction for conspiracy to distribute a controlled substance. We reverse that conviction and vacate the accompanying sentence. That said, we reject Hillard's other claims of error and affirm his remaining convictions and sentence.

FACTS AND PROCEDURAL BACKGROUND

On November 5, 2016, Goodpaster and Hillard's wife, Heidi, arranged a deal to buy methamphetamine. Heidi gave Goodpaster $185, and he handed the money over to Andrew Cummings. Cummings was then supposed to purchase the methamphetamine.

8

Goodpaster, along with his girlfriend, S.S., awaited Cummings' return at a Wichita hotel in Sedgwick County.

Several hours later, Cummings' whereabouts were still unknown. Heidi called Alexandria Scott, who was friends with Cummings, and asked Scott to help Heidi figure out what had happened with the methamphetamine deal. Brian Bussart and Willie Morris, both acquaintances of the Hillards, picked up Scott in the Hillards' white Chevrolet truck. They then met up with the Hillards, who were in a Chevrolet Equinox, and the two parties drove to the hotel where Goodpaster and S.S. were staying.

The group gained access to Goodpaster's hotel room and started interrogating Goodpaster and S.S. about the drug deal. While in Goodpaster's hotel room, the group learned the deal fell through. Heidi became angry with what she perceived as S.S.'s lack of cooperation, and Heidi began to suspect S.S. might be wearing a wire. After checking S.S. for a wire, Heidi and Scott took S.S.'s two cell phones from the room. Heidi ordered S.S. and Goodpaster to leave with the group. S.S. began crying because she did not want to leave with them, but Heidi threatened to hurt S.S. if she did not cooperate.

Goodpaster got into the white Chevrolet truck with Bussart and Morris, and Bussart drove them directly to the Hillards' house at 1310 S. Meridian Street in Valley Center (a city in Sedgwick County). The three men smoked methamphetamine in the truck, and then went into the house to await the arrival of the others. Surveillance video recovered from the Hillards' home surveillance system showed the men in the truck outside the Hillards' home around 4:15 a.m.

In the meantime, S.S. got into the Equinox with the Hillards and Scott. Hillard first dropped Scott off at a friend's house. Before the Hillards and S.S. departed, Scott gave Heidi a white t-shirt from inside the friend's house. Heidi, who was in the backseat with

9

S.S., tied S.S.'s arms behind her back and blindfolded her in the backseat using strips of the t-shirt. Heidi then accused Goodpaster of trying to set her up. She wanted S.S. to tell her about Goodpaster's plan. S.S. told Heidi that she knew Goodpaster had a plan, but she was unaware of its details. Heidi kept insisting that S.S. tell the truth. Heidi then began tasing S.S. on her side, arms, and legs.

Hillard eventually stopped the car. He leaned over the front seat, and either Hillard or Heidi tied some type of cord around S.S.'s neck. The Hillards then pulled S.S.'s pants down and tased her inside her genitals several times. S.S. believed Hillard was holding the taser because it felt like the person tasing her was using more force than Heidi had used previously. S.S. also felt Hillard's weight on her.

In a bid to get the Hillards to stop tasing her, S.S. said she would tell them what they wanted to know. S.S. then began fabricating details of Goodpaster's supposed plan to set up the Hillards. S.S. said the police were involved with the drug deal, and S.S. suggested the Hillards might get arrested. Hillard returned to the driver's seat and drove to the Hillards' house. When they arrived, the Hillards took S.S. into one of several outbuildings on their property and tied her to a chair.

When Bussart saw the Equinox parked outside the Hillards' house, he went to the outbuilding. The Hillards were inside with S.S., who was sitting in a chair, still blindfolded. The Hillards told Bussart that Goodpaster planned to call the Kansas Department for Children and Families, report that Heidi had abused or neglected her children, and then have the Hillards arrested so Goodpaster could rob their house. At the Hillards' request, Bussart went to get Goodpaster from the house. Morris followed Bussart and Goodpaster to the outbuilding. Surveillance video shows the three men walking from the house to the outbuilding around 6 a.m.

Once in the outbuilding, Goodpaster sat in a chair, and the Hillards began questioning him. He denied the existence of any plan to set them up. For several hours, Heidi, aided by Hillard, Bussart, and Morris, continued to question Goodpaster about his alleged plan. The group was often unsatisfied with Goodpaster's answers and began torturing him. Over the course of the interrogation, Goodpaster was hit with various objects, tased, prodded with objects in his ear canal, cut, and threatened with other acts of torture. Hillard also strangled Goodpaster for several seconds with an electrical cord. S.S. eventually joined in and hit Goodpaster with a piece of wood. S.S. testified she did so to convince the Hillards she was on their side. At one point, Hillard even went outside to start a motorcycle and left it running, ostensibly so the engine noise would cover the sound of Goodpaster's screams.

Goodpaster unsuccessfully tried to escape from his tormentors several times. On his first attempt, Bussart tackled him to the ground, and then Bussart, Hillard, and Morris picked him up and brought him back to the chair. A few minutes later, Goodpaster tried to escape again. Members of the group tackled Goodpaster, but this time they bound him to the chair with zip ties. Goodpaster later tried to escape by jumping through a window, but he was tackled by Hillard and Morris outside.

At some point, Bussart left to get cigarettes. When he returned, Hillard and Morris were holding Goodpaster down on the ground outside the outbuilding. Morris retrieved some tape and taped Goodpaster's mouth shut. The group then loaded Goodpaster into a wagon and took him to the truck. Hillard retrieved a piece of rope that had been tied into a noose. They used the rope to bind Goodpaster's feet and pull him into the truck. Goodpaster appeared to be alive when he was loaded into the truck. Hillard then got in the driver's seat, Bussart got in the front passenger seat, and Morris got in the backseat with Goodpaster.

11

The group drove in the truck to the home of Hillard's former brother-in-law, Craig Bright, who also lived in Valley Center. On the way, Bussart could hear Goodpaster breathing heavily. But after three or four minutes, Bussart could no longer hear Goodpaster breathing. Bussart thought Goodpaster might have been dead at that point, but he was not sure.

At Bright's home, Hillard told Bright he needed Bright's help. Hillard asked to stash something at Bright's house and stated that Bright did not need to know what it was. Hillard appeared to have blood on his hands but said it was not his. Bright gave Hillard a roll of paper towels and a bottle of cleaner to get him to leave. Bright observed someone slumped over in the backseat of Hillard's truck. After the group left, Bright immediately called 911.

After the stop at Bright's house, the group drove for about an hour toward rural Harvey County. At some point, either before or after their stop at Bright's house, they discussed how to get rid of Goodpaster's body. They drove on back roads in a rural area until they found an open gate. They stopped the truck, and Hillard, Bussart, and Morris used the rope around Goodpaster's feet to drag him to a creek area. Bussart thought Goodpaster was dead at this point. At Hillard's direction, Bussart removed the rope from Goodpaster's feet and then put it around Goodpaster's neck. Hillard threw the rope over a tree branch, hoisted Goodpaster up, and tied the rope off. Hillard, Bussart, and Morris then drove to a car wash and cleaned the blood from the back floorboard and backseat of the truck. They also had blood on their clothes, so they stopped to get new clothing.

Officers were dispatched to the Hillards' home after receiving Bright's 911 call and another 911 call from Hillard's mother, Shirley Grunder, who had witnessed Hillard and the others loading Goodpaster into the truck. Officers conducted an initial sweep of the

12

property and found Heidi and S.S., along with two children, inside the Hillards' home. Hillard returned home later that day and was arrested.

Officers eventually located Goodpaster's body in Harvey County on November 12, hanging from a tree with a rope around his neck. Forensic pathologist Dr. Ronald Distefano performed Goodpaster's autopsy. He documented many superficial injuries all over Goodpaster's body. In Dr. Distefano's medical opinion, Goodpaster died from asphyxiation by hanging. He reached this conclusion based largely on the fact that law enforcement had discovered Goodpaster's body hanging from a tree. But Dr. Distefano admitted Goodpaster could have also died from positional asphyxiation—that is, Goodpaster was unable to breathe in the truck because of the position of his head and neck.

The State charged Hillard with first-degree premeditated murder, or in the alternative, felony murder; two counts of aggravated kidnapping; aggravated battery; conspiracy to commit distribution of a controlled substance; aggravated robbery; and rape.

Scott, Bussart, and S.S. all testified at the Hillards' joint trial. Scott testified she had pleaded guilty to kidnapping and aggravated robbery for her role in these events. Bussart testified he pleaded guilty to felony murder in exchange for the dismissal of his other charges, including the alternative charge of first-degree premeditated murder, three counts of aggravated battery, aggravated robbery, and two counts of kidnapping. He also testified that as part of his plea agreement, he had to testify truthfully against the Hillards. S.S. was not charged with any offenses in connection with these events.

13

Morris was tried separately and did not testify at the Hillards' trial. See *State v. Morris*, 311 Kan. 483, 463 P.3d 417 (2020) (affirming Morris' convictions for first-degree premeditated murder and several other offenses).

The jury acquitted Hillard of aggravated robbery of S.S. but convicted him of first-degree murder of Goodpaster (under both alternative theories—first-degree premeditated murder and first-degree felony murder), aggravated kidnapping and aggravated battery of Goodpaster, conspiracy to distribute a controlled substance, aggravated kidnapping of S.S., and rape of S.S. The district court sentenced Hillard to life without the possibility for parole for 50 years (a hard 50 sentence), plus 330 consecutive months.

Hillard appeals directly to our court. Jurisdiction is proper. K.S.A. 2020 Supp. 22-3601(b)(4) (criminal appeal taken directly to Supreme Court when the defendant convicted of off-grid crime committed on or after July 1, 1993).

ANALYSIS

Hillard raises many issues on appeal. We address each challenge in the order presented in Hillard's opening brief, beginning with his challenges to the district court's ruling on his motion to suppress and related evidentiary challenges, before moving on to Hillard's alleged trial errors.

I.    *The District Court Did Not Err in Denying Hillard's Motion to Suppress*

As part of their investigation of Goodpaster's death, officers conducted searches of Hillard's home, his home surveillance system, and his cell phone. Hillard moved to suppress the evidence law enforcement obtained from several of these searches. Before addressing the merits of these challenges, we first describe the relevant evidence

14

presented at the suppression hearing, summarize the district court rulings, and identify the controlling standard of review.

A.   *Relevant Facts Developed at the Suppression Hearing*

At 10:45 a.m. on November 6, 2016, Grunder, who lived next door to the Hillards, called 911 and reported seeing Hillard, another man, and two women beating a third man on the ground outside the Hillards' home. She then saw a fourth man come out of a garage with a roll of tape. The victim was put in a wagon and then loaded into a white Chevrolet truck. She reported that Hillard was driving the truck.

Bright called 911 at 11 a.m. to report that Hillard and his cohorts may have just killed a person and were looking to hide the body. When police responded to Bright's residence, Bright told them that Hillard had come to his house around 11 a.m. in a white Chevrolet truck looking for bleach. Hillard told Bright he needed to stash something at Bright's house and told Bright not to ask any questions. Hillard showed his blood-covered hands to Bright and said, "It's about the girls." Bright reported that at least two other people were in the truck. Bright said he observed what might have been a dead body or unresponsive person in the truck as well.

Officers were dispatched to the Hillards' residence sometime between 11:00 a.m. and 11:53 a.m. Officers conducted a cursory search of the premises. They found a chair with a lot of blood on it in an outbuilding as well as items that could have been used to restrain someone in the chair. They also saw bloody clothing, a wagon with what appeared to be blood on it, and blood on the ground outside the outbuilding. This part of the initial search was completed by 11:53 a.m.

15

Sergeant Michael Gordon of the Valley Center Police Department testified that based on the "very bloody scene" in the outbuilding, officers wanted to check for any possible victims inside the residence. Officers knocked on the door of the residence, but nobody answered. Officers eventually forced entry sometime after 11:53 a.m. and found Heidi, S.S., and two children inside. Officers then secured the scene, and Sergeant Gordon began working on a warrant.

During their initial search of the premises, officers observed surveillance cameras on an outbuilding on the property. Tiffany Morland, a Sedgwick County Sheriff's Office investigator, testified that she and another officer believed that "exigent circumstances" justified reentry of the residence to look at surveillance footage, possibly identify the victim, any suspects, or the vehicle, and broadcast that information to law enforcement. Sometime between 2:00 p.m. and 4:57 p.m., Investigator Morland and another officer entered the garage attached to the residence. Inside, they found a monitor displaying real time footage from the camera. They looked for a mouse or keyboard that would allow them to watch previously recorded footage but could not find any type of control.

Warrant M-1 was issued at 4:37 p.m. That warrant authorized officers to search the premises of 1310 S. Meridian Street for many items such as the "[s]urveillance system, including but not limited to cameras and video storage media including digital storage media such as computers" and "[c]ell phones."

After Warrant M-1 was issued, Investigator Morland and two other officers entered the master bedroom of the residence. They observed surveillance system equipment in the room and tried to replay any recorded surveillance video from the security system's digital video recorder (DVR). Investigator Morland felt the viewing was justified because she believed someone's life was in danger based on the 911 calls and the amount of blood in the outbuilding. After confirming the system was not

16

overriding previously recorded video and had captured the events described in Grunder's 911 call, they stopped viewing the footage and applied for warrants to search all recorded surveillance video.

Warrant M-2 was issued on November 6, 2016, at 8:51 p.m. That warrant authorized officers to search the Hillards' residence for marijuana, methamphetamine, and drug paraphernalia.

Warrant M-3 was issued at 8:53 p.m. the same day. That warrant authorized a search of the SWANN brand digital home security system DVR seized from the garage of the Hillards' residence. Warrant M-4 was issued two minutes later. This warrant authorized the search of the SWANN brand digital home security system DVR seized from the master bedroom of the Hillards' residence.

Two cell phones were collected from the Hillards' home under Warrant M-1. The first phone, a black and silver iPhone 6s later identified as Hillard's, was found in the outbuilding. The second phone, a white and silver iPhone 6s, was found in the kitchen of the residence.

Detective Jeremy Noel with the Sedgwick County Sheriff's Office testified that he could not gain access to the cell phones recovered from the Hillards' residence because they were both locked and the software he used could not bypass the lock code on the iPhone 6s. He later received an email from a company called Cellebrite. Cellebrite produces tools that law enforcement can use to bypass the locking mechanisms on various electronic devices. Cellebrite also provides a paid service to unlock higher end phones at its facility in New Jersey. The email confirmed that the company was now able to bypass the lock codes for the iPhone 6s at its facility.

Detective Noel personally verified with Cellebrite that it could help unlock the cell phones. He then applied for search warrants in Sedgwick County to send the cell phones to Cellebrite in New Jersey so the company could extract the passcodes. He also coordinated with New Jersey law enforcement to secure a similar search warrant in Morris County, New Jersey, where Cellebrite's facility was located.

Warrant M-5 was issued on September 26, 2017, authorizing the search of Hillard's cell phone. Warrant M-6 was issued on the same day, authorizing the search of the cell phone seized from the kitchen. Both warrants specifically authorized Cellebrite to assist law enforcement in unlocking the phones.

A court in Morris County, New Jersey, issued Warrant M-7 on September 28, 2017. That warrant authorized Cellebrite to help unlock the cell phones at its New Jersey location.

Detective Noel flew to New Jersey with the cell phones, dropped them off at Cellebrite's facility, and returned to Kansas. About six weeks later, he received word that Cellebrite had successfully unlocked Hillard's cell phone. He returned to New Jersey to retrieve both cell phones. Once back in Kansas, he applied for another search warrant to extract information from Hillard's cell phone. Warrant M-8 was issued on December 15, 2017, authorizing the search of Hillard's phone.

While searching Hillard's phone under Warrant M-8, Detective Noel found three audio recordings later admitted at trial. One recording captured part of the events that took place in Goodpaster's hotel room. A second recording captured part of the Hillards' interrogation of S.S. in the Equinox. And a third recording captured part of Goodpaster's interrogation and torture in the outbuilding.

18

B.  *District Court Proceedings on Hillard's Motion to Suppress*

Hillard moved to suppress the evidence seized from his residence and cell phone on three grounds:  (1) law enforcement conducted a warrantless search of his residence; (2) the search warrant (presumably Warrant M-1) was not supported by probable cause; and (3) officers exceeded the scope of the search warrant when they searched and retrieved data from the surveillance system and Hillard's cell phone.

Hillard also argued that a significant breach in the chain of custody rendered the evidence obtained from his cell phone inadmissible. He noted that law enforcement had left his cell phone in the possession of "noncommissioned personnel" in New Jersey and one of the audio recordings taken from his cell phone had been enhanced.

In response, the State argued the initial sweep of Hillard's residence was justified under the emergency aid exception to the warrant requirement. The State argued that all later searches were authorized by search warrants supported by probable cause. Finally, the State argued the chain of custody challenge went to the weight, not the admissibility, of the evidence.

The district court held an evidentiary hearing where Sergeant Gordon, Investigator Morland, and Detective Noel testified. During argument on the motion, Hillard reiterated the issues in his written motion but also raised new ones. He argued the search warrants for the Hillards' residence were not specific enough because someone could mistakenly believe that one of the outbuildings covered by the warrant was on Grunder's property. He also argued the State violated his Fifth Amendment due process rights and Sixth Amendment confrontation rights by sending his cell phone to Cellebrite without first holding a hearing.

19

The district court denied Hillard's motion to suppress and related evidentiary challenges. On appeal, Hillard argues the district court committed multiple errors in its ruling.

C. *Standard of Review and Relevant Legal Framework*

When reviewing a district court's ruling on a motion to suppress, this court applies a bifurcated standard of review—the district court's factual findings are reviewed for substantial competent evidence and the district court's legal conclusions are reviewed de novo. *State v. Neighbors*, 299 Kan. 234, 240, 328 P.3d 1081 (2014). "When material facts underlying defendant's claim are not disputed, 'the issue is a question of law over which an appellate court has unlimited review.'" *State v. Hachmeister*, 306 Kan. 630, 637, 395 P.3d 833 (2017) (quoting *State v. Powell*, 299 Kan. 690, 700, 325 P.3d 1162 [2014]). Unless otherwise indicated, this standard of review applies to the issues raised in Hillard's motion to suppress.

The Fourth Amendment to the United States Constitution provides that,

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

We have determined these rights and protections to be coterminous with those set forth in section 15 of the Kansas Constitution Bill of Rights. See *Neighbors*, 299 Kan. at 239.

Generally, the Fourth Amendment requires law enforcement to conduct searches and seizures pursuant to a warrant. Warrantless searches and seizures, including warrantless entries into private dwellings, are per se unreasonable unless they fall

20

within recognized exception to the warrant requirement. 299 Kan. at 239; *State v. Sanchez-Loredo*, 294 Kan. 50, 55, 272 P.3d 34 (2012).

A warrant authorizing law enforcement to search premises and seize evidence must be supported by an affidavit supplying probable cause. When deciding whether an affidavit supplies probable cause, a judge "considers the totality of the circumstances presented and makes 'a practical, common-sense decision whether a crime has been or is being committed and whether there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *State v. Mullen*, 304 Kan. 347, 353, 371 P.3d 905 (2016) (quoting *State v. Hicks*, 282 Kan. 599, 613-14, 147 P.3d 1076 [2006]).

The language in the warrant must also be sufficiently particular that law enforcement can reasonably locate the place to be searched and identify the items authorized to be seized. *State v. Patterson*, 304 Kan. 272, 275, 371 P.3d 893 (2016); *State v. Francis*, 282 Kan. 120, 126, 145 P.3d 48 (2006). If the scope of a search exceeds that authorized by a valid warrant, "'the subsequent seizure is unconstitutional without more.'" *Patterson*, 304 Kan. at 275.

The State bears the burden of proving that a search and seizure was lawful under the Fourth Amendment. *State v. Thompson*, 284 Kan. 763, 772, 166 P.3d 1015 (2007). If the State cannot meet this burden, the district court may bar the admission of the unlawfully obtained evidence at trial under the exclusionary rule—"a judicially created rule that safeguards against unconstitutional searches and seizures by suppressing illegally seized evidence as a deterrent to future violations." *Powell*, 299 Kan. at 694-95.

Having established the facts relevant to Hillard's suppression challenges, along with the controlling legal framework and standard of review, we now address the merits of each challenge in turn.

21

D. *The Emergency Aid Exception Justified the Initial, Cursory Search of Hillard's Residence*

Hillard first contends that law enforcement's initial warrantless sweep of the premises violated his Fourth Amendment right to be free from unreasonable searches and seizures. The State responds that the emergency aid exception to the warrant requirement justified this initial cursory search.

The emergency aid doctrine is one of several recognized exceptions to the warrant requirement. *Neighbors*, 299 Kan. at 239. The doctrine applies when: "(1) law enforcement officers enter the premises with an objectively reasonable basis to believe someone inside is seriously injured or imminently threatened with serious injury; and (2) the manner and scope of any ensuing search once inside the premises is reasonable." 299 Kan. at 249; see also *Brigham City v. Stuart*, 547 U.S. 398, 400, 126 S. Ct. 1943, 164 L. Ed. 2d 650 (2006) ("police may enter a home without a warrant when they have an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury").

In determining its application, district courts consider whether the totality of the circumstances created a reasonable belief that someone within the premises to be searched may need immediate aid. See *United States v. Porter*, 594 F.3d 1251, 1259 (10th Cir. 2010); *United States v. Najar*, 451 F.3d 710, 720 (10th Cir. 2006). "Reasonable belief does not require absolute certainty; the standard is more lenient than the probable cause standard." *Porter*, 594 F.3d at 1258. "Officers do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception." *Michigan v. Fisher*, 558 U.S. 45, 49, 130 S. Ct. 546, 175 L. Ed. 2d 410 (2009).

While the district court did not specifically use the term "emergency aid" exception" in its ruling, it is apparent the court applied that doctrine here. The district court found that before the initial cursory search of Hillard's residence, officers had received the information Grunder and Bright reported in their 911 calls. Officers also discovered a large amount of blood and blood-covered objects on the ground outside and inside the outbuilding at the Hillards' residence. The court also found that officers conducted a limited search, only going so far as necessary to determine whether any injured parties were on or within the premises. The district court determined that these circumstances justified the officers' limited, warrantless search of the premises to check for others who may need immediate aid.

We hold that the district court findings are supported by substantial competent evidence. In turn, these findings lend adequate support to the district court's legal conclusion that the officers' initial search was lawful. As to the evidence supporting the district court findings, Grunder reported in her 911 call that she had observed Hillard, another man, and two women beating a third male (victim) who was on the ground of the premises at 1310 S. Meridian in Valley Center. She reported that a fourth man came out of a garage with a roll of tape, and the victim was then placed in a wagon and loaded into a white Chevrolet truck. Grunder further reported that at least two individuals had just left the scene in the truck, but she did not suggest that all parties had vacated the premises. Several minutes later, Bright reported that Hillard may have killed somebody and was looking for a place to hide the body. Bright also told police that Hillard had blood on his hands and made the enigmatic statement, "It's about the girls." Law enforcement officers testified that upon arriving at the Hillards' residence, they found bloody objects and blood on the ground outside an outbuilding as well as a "bloody scene" inside. This testimony provides substantial competent evidence supporting the district court findings.

23

As to the district court's legal conclusion, the presence of blood on the premises, coupled with two separate 911 calls reporting that a violent incident involving several people had just taken place on the Hillards' property, provided officers with reason to believe others may have needed immediate aid, justifying a brief, warrantless search. See, e.g., *United States v. Salava*, 978 F.2d 320, 324-25 (7th Cir. 1992) (warrantless entry of trailer justified based on report that caller had given ride to a man who said he killed someone, was covered in blood, possessed shotgun, and caller had dropped man off at trailer); *Met v. State*, 388 P.3d 447, 467 (Utah 2016) (warrantless entry of basement bathroom justified when officers saw blood on wall of basement's main room while looking for missing child who could have been seriously injured). Hillard does not contest the district court's finding that the officers' initial search was limited to checking the residence for others in immediate need of aid. Thus, the manner and scope of the ensuing search is not in dispute.

For these reasons, we affirm the district court's ruling that the initial warrantless search, which ended after the four individuals were removed from the residence, was lawful under the emergency aid exception.

E. *No Evidence Was Seized from the Officers' Attempts to Search Surveillance Footage in the Attached Garage Without a Warrant*

Hillard also argues that no exception to the warrant requirement justified the officers' reentry into the residence to attempt to view surveillance footage in the attached garage. This search took place after officers completed their initial emergency aid sweep but before the magistrate issued Warrant M-1, authorizing the search of the residence. Thus, the emergency aid exception cannot validate this search.

24

We note, however, that officers did not seize any evidence during this search. Investigator Morland testified that she saw only a live feed from one of the surveillance cameras, and her attempts to play any previously recorded footage proved unsuccessful at that time. Further, law enforcement officers did not use any of the information gleaned from these unsuccessful attempts to view the surveillance video in the probable cause affidavit supporting Warrant M-1. In fact, Investigator Morland testified that she learned that M-1 had been issued while she was trying to view the surveillance footage in the garage.

Thus, even if the search were invalid, law enforcement recovered no evidence, either directly or indirectly, as a result. Thus, Hillard's challenge is moot. See *United States v. Stearn*, 597 F.3d 540, 544 n.3 (3d Cir. 2010) (because no evidence was seized, motion to suppress moot); *United States v. Walker*, No. 1:12-cr-1 (WLS), 2014 WL 4411570, at *1 (M.D. Ga. 2014) (unpublished opinion) (denying suppression motion as moot where no evidence seized during search), *aff'd sub nom. United States v. Burk*, 737 Fed. Appx. 963 (11th Cir. 2018) (unpublished opinion); *United States v. Garrett*, No. 4:08CR00703 ERW, 2009 WL 1086974, at *6 (E.D. Mo. 2009) (unpublished opinion) ("Because there is no evidence to suppress, Defendant's Motion to Suppress Evidence will be denied, as moot."); see also *United States v. Brown*, 584 F.2d 252, 255 (8th Cir. 1978) (where evidence was not introduced as a result of these searches, "'there is nothing upon which the exclusionary rule can operate'"); *United States v. Nieves-Cortez*, 401 Fed. Appx. 263, 264 (9th Cir. 2010) (unpublished opinion) (finding motion to suppress moot when government did not introduce seized evidence subject to the motion to suppress at trial); *United States v. Liu*, No. 19-CR-804 (VEC), 2021 WL 6127396, at *3 (S.D.N.Y. 2021) (unpublished opinion) (motion to suppress moot where no evidence seized during search being used against defendant).

F.   *The Affidavit Supporting Warrant M-1 Provided Probable Cause to Seize Hillard's Home Surveillance System*

Hillard next argues the affidavit supporting Warrant M-1 lacked information establishing probable cause to seize his home surveillance system. The district court generally found that all the search warrants were supported by probable cause.

1.   *Standard of Review and Relevant Framework*

As noted, in deciding whether an affidavit provides probable cause for a search warrant, "'[a] judge . . . considers the totality of the circumstances presented and makes 'a practical, common-sense decision whether a crime has been or is being committed and whether there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Mullen*, 304 Kan. at 353. In making a probable cause determination, judges may draw reasonable inferences from the information in the affidavit and "'practical considerations of everyday life'" to determine the likelihood that evidence of a crime will be found in a particular place. *United States v. Biglow*, 562 F.3d 1272, 1280 (10th Cir. 2009); see *State v. Fewell*, 286 Kan. 370, 378, 184 P.3d 903 (2008); *State v. Fisher*, 283 Kan. 272, 306, 154 P.3d 455 (2007). Such inferences are appropriate because "probable cause is a matter of 'probabilities and common sense conclusions, not certainties.'" *Biglow*, 562 F.3d at 1280. Further, judges may rely on an officer's opinion, based on his or her professional experience, about where certain evidence may be located. 562 F.3d at 1279.

We review a district court's probable cause determination with deference to the lower court:

"'When an affidavit in support of an application for search warrant is challenged, the task of the reviewing court is to ensure that the issuing magistrate had a substantial basis for concluding probable cause existed. This standard is inherently deferential. It does not demand that the reviewing court determine whether, as a matter of law, probable cause existed; rather, the standard translates to whether the affidavit provided a substantial basis for the magistrate's determination that there is a fair probability that evidence will be found in the place to be searched. Because the reviewing court is able to evaluate the necessarily undisputed content of an affidavit as well as the issuing magistrate, the reviewing court may perform its own evaluation of the affidavit's sufficiency under this deferential standard.'" *Mullen*, 304 Kan. at 358.

2. *The Affidavit Supporting Warrant M-1 Provided a Substantial Basis for the District Court's Probable Cause Determination*

The affidavit of probable cause for Warrant M-1 set forth the information Grunder and Bright had reported to law enforcement during their 911 calls. It also described the bloody scene officers discovered during their emergency aid sweep. As for the surveillance system specifically, the affidavit states:

"Cameras were seen on the outside of the residence and at least one of the outbuildings/garages which your Affiant believes may show evidence related to the crime. Affiant knows through his training and experience that computers and cellphones can be used to monitor and/or record images and/or video from security systems."

We conclude the affidavit provided a substantial basis for the court to determine there was a fair probability that evidence of a crime would be found in the surveillance system. The affidavit established that officers had observed security cameras located on the outside of the residence and at least one outbuilding on the premises. Grunder's 911 call suggested that the crimes being investigated had occurred, at least in part, outside the residence and outbuildings. It is reasonable to infer from this evidence that the security cameras located outside recorded the events described in Grunder's 911 call. This

27

inference was corroborated even more by Officer Gordon's averments that, based on his training and experience, surveillance footage can be recorded electronically. Thus, we affirm the district court determination that Warrant M-1 was supported by probable cause. See *United States v. Saddler*, 19 F.4th 1035, 1039 (8th Cir. 2021) ("issuing magistrate had a 'substantial basis' to believe there was a 'fair probability' that evidence related to the shooting would be found [in apartment]" when affidavit detailed known events about the shooting and security camera in the apartment's window pointed to parking lot where shooting had occurred).

G. *Inevitable Discovery Doctrine Applies to Information Obtained Pursuant to Law Enforcement's Search Exceeding the Scope of Warrant M-1*

Hillard next argues that officers exceeded the scope of Warrant M-1 when they viewed surveillance footage from the DVR in the master bedroom, rather than simply seizing the DVR. The district court declined to suppress any evidence on this basis, finding that exigent circumstances justified viewing the surveillance video and that the video would have been discovered under subsequent search warrants. On appeal, the State concedes that officers exceeded the scope of M-1 by viewing the surveillance footage but argues the search was justified under the emergency aid exception, the exigent circumstances plus probable cause exception, or both. Alternatively, the State argues the surveillance footage need not be suppressed because it would have been inevitably discovered through lawful means.

Warrant M-1 authorized officers to search the Hillards' residence and to seize any surveillance system equipment, but it did not specifically authorize officers to view any recorded footage. Here, the officers searched the security footage from the master bedroom DVR only momentarily to confirm that it had captured the incident Grunder reported in her 911 call. No evidence was seized during this search. Instead, officers reported their discovery in the probable cause affidavits for Warrants M-3 and M-4,

28

which authorized the search of the surveillance system DVRs seized from the garage and master bedroom. Thus, in issuing Warrants M-3 and M-4, the district court relied, in part, on the unlawfully acquired information that the security system had in fact recorded the incident Grunder reported. So while no evidence was directly obtained when officers exceeded the scope of Warrant M-1, the surveillance footage obtained under Warrants M-3 and M-4 could still be subject to suppression as fruit of the poisonous tree. See *State v. Deffenbaugh*, 216 Kan. 593, 598, 533 P.2d 1328 (1975) (fruit of the poisonous tree doctrine "extend[s] the scope of the exclusionary rule to bar not only evidence directly seized, but also evidence indirectly obtained as a result of information learned or leads obtained in the unlawful search").

The record does not support the State's argument that officers were justified in exceeding the scope of Warrant M-1 under the emergency aid or exigent circumstances exceptions to the warrant requirement. At the time of this search, officers had completed their cursory search of the premises, secured the scene, and confirmed no other party needed immediate aid. See *Lange v. California*, 594 U.S. ___, 141 S. Ct. 2011, 2017, 210 L. Ed. 2d 486 (2021) (exigencies justifying warrantless search include: to protect injured person or person in imminent danger; to protect officer's own safety; to prevent imminent destruction of evidence; prevent a suspect's escape).

But this conclusion does not end our analysis because the State also argues the evidence obtained from Warrants M-3 and M-4 was admissible under the inevitable discovery doctrine—an exception to the exclusionary rule that allows the admission of illegally obtained evidence if that evidence would have been discovered through lawful means. *State v. Baker*, 306 Kan. 585, 590-91, 395 P.3d 422 (2017). The State contends Warrants M-3 and M-4 were supported by probable cause, even without the unlawful

29

averment law enforcement included in the probable cause affidavit. Thus, the State believes the officers would have discovered this information through the lawfully issued warrants.

To determine whether the inevitable discovery doctrine applies here, we must first decide whether Warrants M-3 and M-4 were supported by probable cause. When an "affidavit contains both lawfully and unlawfully obtained information, the court asks whether the affidavit supplied a substantial basis for finding probable cause absent the unlawfully obtained information." *State v. Hubbard*, 309 Kan. 22, 33, 430 P.3d 956 (2018). As previously noted, the "substantial basis standard" is inherently deferential. 309 Kan. at 33.

We hold that the affidavits supporting Warrants M-3 and M-4 supplied a substantial basis for probable cause even after excising the information officers obtained from the cursory search of the DVR in the master bedroom. In those affidavits, Officer Gordon again described the information officers had received from the two 911 calls and the bloody scene they discovered upon their arrival at the Hillards' property. This information establishes probable cause that a crime had occurred on the premises. Further, both affidavits confirmed that officers had observed security cameras outside the buildings on the premises. And, based on his training and experience, Officer Gordon confirmed that footage from such cameras can be recorded and saved on various electronic devices. Viewed together, these averments provided a substantial basis to conclude there was a fair probability that evidence would be found on the surveillance system equipment. This conclusion is bolstered by other averments in the affidavit stating that officers had discovered surveillance system equipment, including the two DVRs, in the garage and the master bedroom—information they obtained within the scope of the search authorized by Warrant M-1. See *Banks v. Town of Plainville*, 506 F. Supp. 3d 122, 130 (D. Mass. 2020) (even without considering challenged averments, the affidavit

30

supported probable cause where plaintiff claimed to have witnessed incident outside his property and said he had one or more security cameras on the property, which "suggested implicitly that the camera(s) may have captured the incident"); cf. *Fisher*, 283 Kan. at 309 (even after excising challenged portions, affidavit provided substantial basis that there was a fair probability evidence of crime would be found in place to be searched, and district court properly denied motion to suppress).

Because Warrants M-3 and M-4 were supported by probable cause even without the unlawfully obtained information, the exclusionary rule does not bar admission of the surveillance video. Thus, we affirm the district court's order denying Hillard's motion to suppress this evidence.

H.  *Hillard Failed to Preserve His Request to Suppress Evidence Based on Detective Noel's Attempt to Unlock Hillard's Phone*

Hillard argues Detective Noel's unsuccessful attempts to unlock his cell phone constituted an unreasonable search. At the suppression hearing and at trial, Detective Noel testified to these unsuccessful attempts to unlock the cell phones recovered from the Hillards' residence. Detective Noel tried to unlock the cell phones before law enforcement had applied for or received warrants to search the cell phones.

Hillard did not raise this argument before the district court, so it is not properly preserved for our review. See *State v. Rizo*, 304 Kan. 974, 978, 377 P.3d 419 (2016) ("In general, issues not raised before the trial court cannot be raised for the first time on appeal."). Even if Hillard had preserved this issue, Detective Noel did not obtain any evidence from his unsuccessful attempts to unlock the phone. Nor did he use the locked status of the phone to bolster the probable cause affidavits for Warrants M-5 and M-8, which authorized law enforcement to search Hillard's cell phone. As we established, a motion to suppress evidence is moot where the search yields no evidence.

31

I. *We Decline to Reach Hillard's Claim that the Search Warrants for His Cell Phone Were Overbroad*

Hillard argues for the first time on appeal that the warrants to search his cell phone, Warrants M-5 and M-8, lacked particularity because they did not meaningfully limit the scope of the search of this device. "Generally, constitutional claims cannot be raised for the first time on appeal." *State v. Daniel*, 307 Kan. 428, 430, 410 P.3d 877 (2018). Still, we have recognized several exceptions to this general rule, including when a party establishes "the claim involves only a question of law arising on proved or admitted facts and is determinative of the case; consideration of the claim is necessary to serve the ends of justice or prevent the denial of fundamental rights; or the district court is right for the wrong reason." *State v. Alvarez*, 309 Kan. 203, 209, 432 P.3d 1015 (2019).

Hillard claims we should reach this constitutional issue because it meets two of the recognized exceptions: (1) it involves only a question of law that is determinative of the case and arises from proved or admitted facts; and (2) consideration of the claim is necessary to serve the ends of justice or prevent the denial of his fundamental rights.

As to the first exception, Hillard's challenge does not present a question of law determinative of the case that arises from proved or admitted facts. Granted, we can likely determine the facial validity of the warrants without additional factual findings. But if we were to conclude the warrants were invalid, it would not necessarily follow that the evidence recovered from Hillard's cell phone must be suppressed. Under the good-faith exception to the exclusionary rule, evidence need not be suppressed when it is obtained by officers acting in objectively reasonable reliance on a search warrant issued by a detached and neutral judge, even if that warrant is later held invalid. *State v. Zwickl*, 306 Kan. 286, 292, 393 P.3d 621 (2017); see also *United States v. Russian*, 848 F.3d 1239, 1246-48 (10th Cir. 2017) (finding officer reasonably relied on search warrant for

32

cell phone even though warrant was facially invalid due to lack of particularity). Because Hillard did not raise this issue below, the State did not get the chance to prove Detective Noel acted with objectively reasonable reliance on the warrants, and the district court had no opportunity to make factual findings relevant to the good-faith exception. Thus, Hillard's constitutional claim does not present a pure question of law determinative of the case arising from proved or admitted facts.

As to the second exception, even if Hillard's claim involves fundamental rights—and the Fourth Amendment right to be free from unreasonable searches and seizures is a fundamental right—the decision to hear that claim for the first time on appeal is still within our discretion. See *Rizo*, 304 Kan. at 979. We have declined invitations to review constitutional claims implicating fundamental rights for the first time on appeal, particularly when those claims would require us to make factual findings. See, e.g., *State v. Ortega-Cadelan*, 287 Kan. 157, 159-61, 194 P.3d 1195 (2008) (declining to hear state constitutional cruel and unusual punishment claim for first time on appeal because it would require court to make fact-findings). And based on the record before us, we cannot determine whether reversible error has occurred. See *State v. Williams*, 275 Kan. 284, 289, 64 P.3d 353 (2003) ("[T]o serve the ends of justice or to prevent the denial of fundamental rights, it follows that, on consideration, we must find reversible error occurred."). Exercising our discretion, we decline to reach the merits of this argument raised for the first time on appeal.

J.  *Law Enforcement Did Not Violate Hillard's Constitutional Rights by Sending His Cell Phone to Cellebrite Without Holding a Hearing First*

Hillard contends the State violated the Fifth Amendment's Due Process Clause and the Sixth Amendment's Confrontation Clause by delivering his cell phone to Cellebrite

33

without holding a hearing first. The district court rejected Hillard's challenge, concluding that law enforcement has no duty to consult a criminal defendant on its method of investigation.

While Hillard raises his claim under the Fifth Amendment's Due Process Clause, that provision applies only to the federal government. See *Al-Turki v. Tomsic*, 926 F.3d 610, 614 (10th Cir. 2019) ("The Fifth Amendment's Due Process Clause forbids the federal government from depriving any person 'of life, liberty, or property, without due process.'"). Hillard's challenge is based on state action only. Thus, we construe Hillard's challenge under the Fourteenth Amendment's Due Process Clause, which forbids state governments from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1; see also *Al-Turki*, 926 F.3d at 614 (Fifth Amendment Due Process Clause and Fourteenth Amendment Due Process Clause generally provide same protections). "'The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner."'" *State v. Juarez*, 312 Kan. 22, 24, 470 P.3d 1271 (2020) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S. Ct. 893, 47 L. Ed. 2d 18 [1976]).

The Sixth Amendment's Confrontation Clause, made applicable to the states through the Fourteenth Amendment, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI; *State v. Laturner*, 289 Kan. 727, 731, 218 P.3d 23 (2009). "The primary purpose of the Sixth Amendment Confrontation Clause is to give the accused the opportunity for cross-examination to attack the credibility of the State's witnesses." *State v. Friday*, 297 Kan. 1023, Syl. ¶ 19, 306 P.3d 265 (2013).

Hillard provides no authority to establish that either the Fifth, Sixth, or Fourteenth Amendments require law enforcement to hold a hearing before coordinating with a third

party during an investigation. But see *State v. LaMae*, 268 Kan. 544, 550, 998 P.2d 106 (2000) (State's failure to preserve evidence may violate due process if done in bad faith). Nor does Hillard explain why his argument is meritorious despite a lack of supporting authority. This amounts to a failure to adequately brief the issue. *State v. Salary*, 309 Kan. 479, 481, 437 P.3d 953 (2019) (failure to support a point with pertinent authority or show why it is sound despite a lack of supporting authority is akin to failing to brief issue). Thus, we consider this point waived and abandoned. See 309 Kan. at 481 (issues not adequately briefed are treated as waived and abandoned).

Even so, we note that the district court held an evidentiary hearing on Hillard's motion to suppress, which afforded him a meaningful opportunity to challenge the State's conduct. Even though the State had delivered the cell phones to Cellebrite before this hearing, the district court was well-positioned to remedy any alleged constitutional violations through the exclusionary rule. The same is true of Hillard's objections to the admission of the audio recordings recovered from his cell phone—Hillard had meaningful opportunity to object to the admission of this evidence at trial, and the district court could have excluded any evidence that law enforcement acquired unlawfully. Nor does Hillard identify any evidence from Cellebrite that was admitted at trial without allowing him to test its credibility on cross-examination. Hillard fails to establish error on this point.

K. *The District Court Did Not Abuse Its Discretion by Admitting Evidence Obtained from Hillard's Cell Phone*

Hillard claims the evidence obtained from the search of his cell phone is inadmissible because Detective Noel broke the chain of custody by delivering the phone to Cellebrite. Hillard raised this argument in his motion to suppress and objected to the admission of the cell phone evidence at trial on the same basis. The district court rejected

the argument, finding the State had established an adequate chain of custody and Cellebrite did not materially alter the contents of the phone by unlocking it.

### 1. *Relevant Legal Framework and Standard of Review*

"A party offering an object into evidence must show with reasonable certainty that the object has not been materially altered since the object was taken into custody. However, the party is not required to keep the object under lock and key or continuously sealed up. The test for chain of custody is a reasonable certainty that the object has not been materially altered. Any deficiency in the chain of custody goes to the weight of the evidence rather than its admissibility." *State v. Horton*, 283 Kan. 44, 62, 151 P.3d 9 (2007).

"'A district judge's determination of whether there is a reasonable certainty that a piece of evidence has not been materially altered is reviewed for abuse of discretion.'" *State v. Moore*, 302 Kan. 685, 702, 357 P.3d 275 (2015). A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *State v. Ingham*, 308 Kan. 1466, 1469, 430 P.3d 931 (2018). The party asserting the district court abused its discretion bears the burden of showing such abuse of discretion. *State v. Thomas*, 307 Kan. 733, 739, 415 P.3d 430 (2018).

### 2. *Hillard Fails to Establish an Abuse of Discretion*

The State met its burden to show with reasonable certainty that Hillard's cell phone had not been materially altered since it was taken into custody. Detective Noel testified that after the cell phones were collected from the Hillards' residence, they were submitted into "our property and evidence" at the Sedgwick County Sheriff's Office. Detective Noel personally delivered the phones, which were sealed in sheriff's

36

department packages, to Cellebrite's facility in New Jersey. He "had to push a button to be buzzed in" to Cellebrite's secured facility, and an employee met him at the door and asked for identification. Detective Noel then met with the employee responsible for unlocking the devices and turned the phones over to her. When Cellebrite had completed the work, Detective Noel personally returned to Cellebrite's facility in New Jersey to collect the phone. Once again, he had to show identification to enter the building. Cellebrite returned the cell phones to him in a sealed package. Detective Noel testified that the cell phones appeared to be in substantially similar condition to when he had dropped them off. And, after Cellebrite had unlocked the phone, he had S.S., Bussart, and Scott independently authenticate the audio recordings Detective Noel obtained from Hillard's cell phone.

Hillard does not challenge any of the district court chain of custody findings. Nor does he contend the district court admitted the audio recordings from the cell phone based on an error of law. Instead, he suggests that no reasonable person would have taken the view adopted by the district court. We disagree.

Detective Noel's testimony established the chain of custody from the moment the cell phone was seized from Hillard's residence to the admission of the evidence at trial. While law enforcement temporarily surrendered possession of the phone to Cellebrite, the State's evidence showed that the phone and its contents were not altered in this process. And Cellebrite's ability to unlock the phone did not alter the data in it; it merely provided access to it. We conclude that Hillard's alleged deficiency in the chain of custody does not render the evidence inadmissible. See *Horton*, 283 Kan. at 62 (party offering evidence need not keep it under lock and key or continuously sealed up); see also *State v. Niblock*, 230 Kan. 156, 164-65, 631 P.2d 661 (1981) (chain of custody not broken when officer signed gun over to KBI laboratory and gun was placed in KBI evidence locker); *United States v. Walker*, 677 Fed. Appx. 53, 58 (3d Cir. 2017) (unpublished opinion)

(alleged deficiencies in government's chain of custody were not serious enough to render photos recovered from search of cellphone inadmissible; government testimony establishing general handling of phone and method used to recover photos sufficient for admissibility purposes). Thus, the district court correctly found the alleged deficiencies in the chain of custody for Hillard's phone went to the weight of the evidence obtained, not its admissibility. See *Woessner v. Labor Max Staffing*, 312 Kan. 36, 51, 471 P.3d 1 (2020) (deficiency in chain of custody goes to weight of the evidence rather than its admissibility).

L.  *The District Court Did Not Abuse Its Discretion by Admitting an Enhanced Version of an Audio Recording Recovered from Hillard's Cell Phone*

Next, Hillard argues the district court erred in admitting into evidence an enhanced version of the audio recording made in Goodpaster's hotel room because the State failed to lay an adequate foundation.

1.  *Standard of Review*

"'The question of whether evidentiary foundation requirements have been met is left largely to the discretion of the district court. Under an abuse of discretion standard, an appellate court will not disturb a district court's decision unless no reasonable person would have taken the same view. '" *State v. Jenkins*, 311 Kan. 39, 45, 455 P.3d 779 (2020).

2.  *District Court Did Not Abuse Its Discretion by Admitting the Enhanced Audio Recording*

In laying the foundation for the admission of the enhanced audio recording at trial, Detective Noel testified that he gave the original recording to the Lawrence Police Department because it had software that can "clean up" audio recordings. He explained

38

the software is designed to reduce background noise and make it easier to hear voices, but it does not alter the voices themselves. Detective Noel testified that he had listened to the original and enhanced versions of the audio and found no significant difference between them. Bussart and S.S. authenticated the recording as well. The State offered both the original and the enhanced versions of the audio recording into evidence. Hillard objected to the admission of the enhanced version because it had been modified from the original, but the district court admitted both versions.

Hillard cites no authority suggesting enhancement of an audio recording automatically renders that recording inadmissible. And appellate courts have affirmed the trial court's decision to admit enhanced audio and video recordings at trial when the State establishes that the enhanced version is accurate and the recording was enhanced to make its content easier for the jury to understand. See, e.g., *United States v. Carbone*, 798 F.2d 21, 24 (1st Cir. 1986) ("As long as the tape recording is properly authenticated, we see no reason why a recording that has been enhanced to improve its audibility by filtering out background noises and improving the clarity of the voices should not also be allowed in evidence."); *Fountain v. United States*, 384 F.2d 624, 631 (5th Cir. 1967) (affirming admission of audio recordings enhanced to reduce background noise after district court found enhanced version accurately reflected conversation recorded); *United States v. Beeler*, 62 F. Supp. 2d 136, 150 (D. Me. 1999) (affirming admission of edited and enhanced versions of videotape because they were accurate and made content of original videotape easier to understand). Here, the State met this standard by presenting evidence that the audio recording was accurate and was enhanced only to improve clarity.

Hillard argues the State did not identify what software was used to enhance the recording or explain how that software functioned. But the law does not require the State to show how the software operates at a technical level to establish an adequate foundation for admitting enhanced audio recordings. See *United States v. Calderin-Rodriguez*, 244

F.3d 977, 986 (8th Cir. 2001). And Detective Noel testified the software removed background noise without altering the voices or their content.

The district court also admitted both the original and enhanced versions of the audio, enabling the jury to compare the recordings for possible variances. Perhaps more significant, Hillard has identified no substantive difference between the content of the original and the enhanced audio recording. Nor did he contest the authenticity of the enhanced recording. Based on the record before us, Hillard fails to show the district court abused its discretion by admitting the enhanced audio recording at trial.

M. *The District Court Did Not Err by Allowing the Jury to Use Transcripts as Aids in Listening to the Audio Recordings*

Hillard next argues the district court erred by admitting transcripts of the audio recordings as demonstrative exhibits.

At trial, Detective Noel testified that he had prepared transcripts of the three audio recordings found on Hillard's phone because it was hard to understand what was being said during portions of the recorded conversations. When Detective Noel could not understand what was being said, he wrote "inaudible" in the transcripts. He also chose not to transcribe anything when several people were talking at once and it was hard to pick out one voice. S.S. and Bussart assisted Detective Noel by confirming the identity of the speakers on the recordings and clarifying their statements. But Detective Noel ultimately transcribed the recording based on his best interpretation of what was being said and did not adopt any of S.S.'s or Bussart's suggested revisions. The district court admitted the transcripts as demonstrative exhibits over Hillard's objection.

1. *Standard of Review and Relevant Legal Framework*

"Courts possess wide discretion in determining whether to permit the jury to use written transcripts as aids in listening to audiotape recordings." *State v. Kraus*, 271 Kan. 810, 812, 26 P.3d 636 (2001). Thus, we review a district court's decision to admit transcripts for this purpose under an abuse of discretion standard. 271 Kan. at 812-13.

> "The use of a transcript to aid in the understanding of an audio or videotape has been allowed where (1) the audiotaped conversation is difficult to understand; (2) the transcript accurately reflects the conversation; (3) inaudible portions of the audiotaped conversation are recorded as 'inaudible' on the transcript; (4) the trial court instructs the jury that the [transcript] is not evidence and that the evidence is the audio recording itself; (5) the jury is not allowed to take the transcript with them into the jury room for deliberations; and (6) the transcript actually aids the jury in understanding the audiotaped conversation." 271 Kan. at 814.

2. *The District Court Did Not Abuse Its Discretion in Admitting Transcripts as Demonstrative Exhibits*

The record includes evidence supporting each of the *Kraus* factors that guide the district court's discretion in deciding whether to use transcripts as an aid for the jury. All three recordings are difficult to understand at times. Hillard has identified no inaccuracies in the transcripts. Inaudible portions of the dialogue are recorded as "inaudible" in the transcripts. The district court issued a cautionary instruction before the recordings were played. The instruction informed the jury that the transcripts were not evidence, and if the jury found the recording differed from the transcript, the jury should consider only what it heard. The district court also collected the transcripts after the audio recordings were played and did not allow the jury to use them during deliberations.

41

Hillard asserts several challenges to the transcripts. He points out that they were not prepared by a certified court reporter. He also notes that Detective Noel did not identify S.S.'s and Bussart's suggested corrections within the transcript. And he argues the transcripts discouraged the jurors from drawing their own conclusions about what they were hearing. Hillard's challenges all suggest a *possibility* that the transcripts might contain inaccuracies. But Hillard has not directed our attention to any specific error or inaccuracy within the transcripts. See *State v. Owens*, 314 Kan. 210, 221, 496 P.3d 902 (2021) ("the burden of proof is on the party alleging an abuse of discretion"). And Detective Noel's testimony, coupled with the district court's protective measures, support each of the *Kraus* factors favoring the use of the transcripts as demonstrative exhibits to assist the jury. We conclude that the district court reasonably exercised its discretion. *Kraus*, 271 Kan. at 816 (district court did not abuse discretion in allowing jury to use transcript of audio recording where transcript taken from audiotaped conversation as aid, defendant identified no material inaccuracies, and trial court instructed jury that transcript was not evidence).

Hillard also claims the probative value of the transcripts is outweighed by their potential prejudice. See K.S.A. 60-445 ("judge may in his or her discretion exclude evidence if . . . probative value is substantially outweighed by the risk that its admission will unfairly and harmfully surprise a party who has not had reasonable opportunity to anticipate that such evidence would be offered"); see also *State v. Lowrance*, 298 Kan. 274, 291, 312 P.3d 328 (2013) (trial judge may exclude evidence if probative value is substantially outweighed by unduly prejudicial impact). But once again, Hillard identifies no specific error, inaccuracy, or misleading statement found within the transcripts that could have caused undue prejudice. Our review of these recordings confirms the transcripts mainly aid the listener in ascertaining the identity of the speakers, not the substance of their communications. The most incriminating statements captured on the

audio recordings are readily discernable to the listener, even without the transcripts. Thus, the transcripts could not have misled the jury as to these statements.

And though the recordings themselves were disturbing at times (as they recorded the beating and torture of Goodpaster and S.S.), they were also highly probative of nearly every element of the charged offenses. The probative value of the audio recordings outweighed the risk of any undue prejudice. See *Hillard*, 313 Kan. at 851-52 (finding district court did not err in admitting audio recording of Goodpaster's torture because recording was highly probative despite being disturbing). The transcripts of these recordings carried even less prejudicial force. The audio recordings contemporaneously captured the perpetrators' brutalization of S.S. and Goodpaster, along with Goodpaster's pleas for his life. These recordings effectively conveyed the genuine fear, pain, and suffering these victims experienced, along with the unjustified cruelty of the perpetrators' conduct. The demonstrative exhibits merely offer a cold transcript memorializing the content of these communications without conveying the same emotion and authenticity captured on the audio recordings. In Heidi's appeal, we held the probative value of the audio recordings was not substantially outweighed by the risk of any undue prejudice. We have no difficulty reaching the same conclusion for the transcripts of the same audio recordings.

## N.   *Warrant M-1 Did Not Lack Particularity*

Finally, Hillard argues the description of the Hillards' residence in Warrant M-1 lacked the level of particularity required by the Fourth Amendment. This argument arises from the proximity of the Hillards' home, located at 1310 S. Meridian Street in Valley Center, to Grunder's adjacent property at 1300 S. Meridian Street. At the motion hearing, Hillard argued the description of the property and structures in Warrant M-1 could be

43

confused with similar outbuildings located on Grunder's property. Hillard also asserted that the buildings are "all in one compound, they share a common driveway, they belong to family," which increases the propensity for confusion.

To satisfy the Fourth Amendment's particularity requirement, "'the search warrant must describe the premises to be searched with sufficient particularity to permit the executing officer to locate the same from the face of the warrant.'" *Patterson*, 304 Kan. at 275. We interpret warrants "'in a common sense, rather than a hypertechnical, fashion. To do otherwise would tend to discourage police officers from submitting their evidence to a judicial officer before acting.'" 304 Kan. at 275.

Warrant M-1 authorized officers to search "the premises and curtilage of 1310 S Meridian Street, Valley Center, Sedgwick County, Kansas to include, but not be limited to, all structures." The warrant also described the structures on the property:

> "1310 S Meridian Street is a single-story, single-family, frame dwelling with brown brick, maroon trim and a brown shingle roof. The front door of the residence faces west. The numbers '1310' in black numerals on a white background are affixed to the gray post of the front mail box on the curb west of the front door. There are at least five outbuildings/garages on the premises."

On appeal, Hillard argues Warrant M-1 does not satisfy the particularity requirement for multiple occupancy structures because it does not specify which buildings on the premises could be searched. He cites *State v. Gordon*, 221 Kan. 253, 259, 559 P.2d 312 (1977), which held that "a search warrant directed against a multiple occupancy structure generally will be held invalid if it fails to describe the particular room or subunit to be searched with sufficient definiteness to preclude a search of other units." But Hillard's reliance on *Gordon* is misplaced because 1310 S. Meridian Street is not a multiple occupancy structure—that is, it is not "'a structure divided into more than

44

one occupancy unit such as a hotel, apartment house, or similar multiunit dwelling.'" 221 Kan. at 259. Rather, 1310 S. Meridian is a rural residence with multiple outbuildings on the surrounding property.

Warrant M-1 clearly identified the Hillards' residence and specifically authorized officers to search all structures on the premises and curtilage, including the residence and at least five garages or outbuildings. The State's evidence also established that there is no reasonable probability that officers would have mistakenly searched Grunder's home because she lived in a separate residence at a separate address.

We also note that Warrant M-1 incorporated the probable cause affidavit by reference. This affidavit states in relevant part: "The premises [of 1310 S. Meridian] consists of a residence, and at least five outbuildings/garages. The outbuildings are all located east and slightly north of the residence. Officers have confirmed the outbuildings are on the premises of 1310 S. Meridian using the law enforcement Mobilemapper database." These averments also confirm that the warrant satisfied the Fourth Amendment's particularity requirement. See *State v. LeFort*, 248 Kan. 332, 339, 806 P.2d 986 (1991) ("where a warrant fails to describe the area to be searched with sufficient particularity, that defect can be cured by the accompanying affidavit if the affidavit is attached to the warrant and the warrant incorporates the affidavit by reference"); see also *Groh v. Ramirez*, 540 U.S. 551, 557-58, 124 S. Ct. 1284, 157 L. Ed. 2d 1068 (2004) (recognizing that "most Courts of Appeals have held that a court may construe a warrant with reference to a supporting application or affidavit if the warrant uses appropriate words of incorporation, and if the supporting document accompanies the warrant"); *Russian*, 848 F.3d at 1246-47 (considering whether probable cause affidavit described place to be searched with particularity in determining if officer reasonably relied on facially invalid warrant and thus good-faith exception to exclusionary rule applied).

45

For these reasons, we hold that Warrant M-1 was sufficiently particular to meet Fourth Amendment standards.

II. *The Evidence Was Insufficient to Support Hillard's Conviction for Conspiracy to Distribute a Controlled Substance*

Hillard argues the evidence was insufficient to support his conviction for conspiracy to distribute a controlled substance. In her direct appeal, Heidi raised the same issue based on the same trial evidence, and we reversed her conviction and vacated her sentence for that charge because the evidence, at most, established that defendants conspired to *possess* methamphetamine only. *Hillard*, 313 Kan. at 848-50. Based on the outcome in Heidi's appeal, the State concedes error. Thus, we reverse Hillard's conviction for conspiracy to distribute a controlled substance and vacate his 45-month consecutive sentence tied to that conviction.

III. *The District Court Did Not Err in Adding Language to the Elements Instructions*

Hillard next contends the district court erred in adding the phrase "or another for whose conduct he is criminally responsible" to the elements instructions for most of the charged offenses, including: first-degree premeditated murder, felony murder, aggravated kidnapping, aggravated battery, aggravated robbery, and several lesser included offenses to those charges. The language was not included in the elements instructions for the rape charge.

During the jury instructions conference, Hillard objected to adding the phrase "or another for whose conduct he is criminally responsible" to the elements instructions. By adding the phrase, Hillard argued the district court deviated from the pattern instructions. He also asserted that repeating the language in most elements instructions would unduly

46

emphasize the aiding and abetting theory of criminal liability. Hillard contends this phrase was potentially prejudicial because Scott and Bussart testified at trial that they had pled guilty.

A. *Standard of Review and Relevant Legal Framework*

This court reviews jury instruction issues under a four-step process:

"(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *Ward*[, 292 Kan. at 565]." *State v. Plummer*, 295 Kan. 156, 163, 283 P.3d 202 (2012).

Our conclusion in the first step of this analysis determines the test we use to assess prejudice in the fourth step. Hillard objected to the added language at trial, so "any error is reversible only if this court determines that there is a reasonable probability that the error affected the outcome of the trial in light of the entire record." *State v. Stanley*, 312 Kan. 557, 562, 478 P.3d 324 (2020).

B. *The Instructions Are Legally and Factually Appropriate*

The district court added the challenged phrase ("or another for whose conduct he is criminally responsible") to most elements instructions. And, in Instruction 48, the district court instructed the jury on aiding and abetting as an independent theory of criminal liability. The instruction provided:

47

"A person is criminally responsible for a crime if the person, either before or during its commission, and with the mental culpability required to commit the crime intentionally aids another to commit the crime.

"All participants in a crime are equally responsible without regard to the extent of their participation. However, mere association with another person who actually commits the crime or mere presence in the vicinity of the crime is insufficient to make a person criminally responsible for the crime.

"It is not a defense that others who participated in the commission of the crime have or have not been convicted of the crime, any lesser degree of the crime, or some other crime based on the same acts."

We review the challenged phrase in the elements instructions together with Instruction 48, rather than scrutinizing the phrase in isolation. *State v. Rogers*, 276 Kan. 497, 502, 78 P.3d 793 (2003) (on review, "'we are required to consider all the instructions together, read as a whole, and not to isolate any one instruction'"). This approach is especially prudent here because Instruction 48 set forth the basis and parameters for aiding and abetting liability under Kansas law. Then, the challenged phrase added to the elements instructions informed the jury when that theory of criminal liability (described in Instruction 48) could support a conviction, even if Hillard were not the principal actor.

Viewed together, these instructions were both factually and legally appropriate. An aiding and abetting instruction is factually appropriate if, from the totality of the evidence, the jury could reasonably conclude the defendant aided and abetted another in the commission of the crime. *State v. Holt*, 285 Kan. 760, Syl. ¶ 7, 175 P.3d 239 (2008). Hillard does not challenge the factual appropriateness of an aiding and abetting instruction generally. And the jury could reasonably conclude from the State's evidence that Hillard willfully and knowingly associated himself with a criminal venture that

48

included at least three other individuals (Heidi, Bussart, and Morris), and he willfully participated in the charged offenses as part of that venture. The district court also found this case was factually complex and involved multiple actors, and it reasonably concluded from this finding that the modification to the elements instructions would assist the jury in its deliberations. The district court noted that Hillard was charged solely as a principal on at least one charge (rape). Thus, adding the challenged phrase to the other elements instructions helped the jury identify those counts in which Hillard was charged only as a principal.

The instructions were also legally appropriate because they accurately stated the law of aiding and abetting liability. We have found similar instructions to be legally appropriate. See *State v. Bodine*, 313 Kan. 378, 388-89, 486 P.3d 551 (2021). And in Heidi's direct appeal, we held that "[t]hough the challenged phrase was an incomplete summary of that law by itself, the inclusion of the full aiding and abetting instruction completed that summarization for the jury, rendering the instructions legally appropriate." *Hillard*, 313 Kan. at 846.

But Hillard suggests the instructions were not legally appropriate because adding the phrase "or another for whose conduct he is criminally responsible" to the elements instructions deviated from the Pattern Instructions Kansas (PIK). While we have "strongly recommended" the use of pattern instructions, district courts need not use those instructions without alteration. *State v. Moncla*, 262 Kan. 58, Syl. ¶ 5, 936 P.2d 727 (1997). "If the particular facts in a given case require modification of the applicable pattern instruction, or the addition of some instruction not included in PIK, the trial court should not hesitate to make such modification or addition. However, absent such need, PIK instructions and recommendations should be followed." 262 Kan. 58, Syl. ¶ 5. Thus,

49

Hillard cannot establish instructional error based solely on the district court's deviation from PIK. And Hillard fails to challenge the district court's rationale for modifying the instructions.

Hillard also asserts that the district court unduly emphasized the State's aiding and abetting theory by adding the challenged phrase to most of the elements instructions. We have disapproved of other jury instructions that emphasized evidence the State presented at trial, even when those instructions properly stated the law. For instance, in *State v. Cathey*, 241 Kan. 715, 741 P.2d 738 (1987), *disapproved of on other grounds in State v. Schoonover*, 281 Kan. 453, 133 P.3d 48 (2006), the district court instructed the jury that it could consider the defendant's flight after a shooting in determining his guilt or innocence. While evidence of flight is relevant to the defendant's consciousness of guilt, we held the instruction was clearly erroneous because "a trial judge may not single out and give undue emphasis to particular evidence [when instructing the jury]." 241 Kan. at 730-31.

This court addressed a similar instructional challenge in *State v. Beebe*, 244 Kan. 48, 766 P.2d 158 (1988). There, the district court instructed the jury that it could infer malice from the defendant's use of a deadly weapon in a killing. While concluding that any error in the instruction was harmless, we cautioned district courts to avoid instructional language that highlights evidence presented by the State. 244 Kan. at 60.

Here, the jury instructions are distinguishable from those in *Cathey* and *Beebe*. The added phrase "or another for whose conduct he is criminally responsible" does not reference or highlight any of the evidence the State presented at trial. Nor does it tell jurors what inferences they may draw from that evidence.

50

Finally, Hillard raises two constitutional challenges to the jury instructions for the first time on appeal. First, he argues the added language rendered the jury instructions unconstitutionally vague because that language did not clarify when a defendant is criminally responsible for the conduct of another. Second, he argues the added language violated *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), because the elements instructions allowed the State to obtain convictions without proving all the factual circumstances necessary under an aiding and abetting theory.

We generally do not reach constitutional claims raised for the first time on appeal. *Daniel*, 307 Kan. at 430. But we can easily dispose of these constitutional challenges. Both challenges presume that we examine the phrase added to the elements instructions ("or another for whose conduct he is criminally responsible") in isolation, without reference to the complete aiding and abetting instruction given to the jury in Instruction 48. But we review the instructions together as a whole, not in isolation. When doing so, Instruction 48 specifies when a defendant may be criminally responsible for the conduct of another under Kansas law and undermines Hillard's constitutional challenges altogether. Hillard has not argued that the complete aiding and abetting instructions were unconstitutionally vague or violated *Apprendi*. Thus, we conclude that the challenged instructions were not erroneous.

IV. *The District Court's Venue Instructions Were Not Erroneous*

For his second instructional issue, Hillard challenges the jury instructions addressing the proper venue for his criminal prosecution. Based on the elements instructions given at trial, Hillard argues the State had to prove beyond reasonable doubt that Goodpaster was killed in Sedgwick County to convict him of first-degree premeditated murder and felony murder. Hillard argues Instruction 50, which explained

51

other statutory venue rules, allowed the jury to convict him of those crimes even though the evidence showed Goodpaster was killed in Harvey County.

### A. *The Jury Instructions at Issue*

In Instruction 4, the district court provided a standard instruction, based on PIK Crim. 4th 54.110 (modified slightly to include the phrase "or another for whose conduct he is criminally responsible," as discussed in the previous challenge), for the elements of count 1, Hillard's first-degree premeditated murder charge:

> "The defendant, Jeff Hillard, is charged in count one with murder in the first degree. The defendant pleads not guilty.
>
> "To establish this charge, each of the following claims must be proved:
>
> "1.  The defendant, or another for whose conduct he is criminally responsible, intentionally killed Scottie Goodpaster.
>
> "2.  The killing was done with premeditation.
>
> "3.  *This act occurred on or about the 6th day of November, 2016, in Sedgwick County, Kansas*." (Emphasis added.)

The jury instructions for count 2, felony murder, and count 8, rape, also instructed the jury that it must find "[t]his act occurred on or about the 6th day of November, 2016, in Sedgwick County, Kansas." These instructions were also based on PIK. See PIK Crim. 4th 54.120 (felony murder); PIK Crim. 4th 55.030 (rape).

The location in which a defendant commits an offense is not technically an element of any of these crimes. See K.S.A. 2020 Supp. 21-5402 (first-degree murder); K.S.A. 2020 Supp. 21-5503 (rape). Rather, the location in which a crime is committed is a jurisdictional fact that determines the appropriate venue for prosecuting a defendant for the crimes. "Kansas law requires that the jurisdictional facts supporting proper venue be proved in every case . . . . Thus, even though [venue] isn't strictly an element of the offense, it is, as a practical matter, handled as if it were." *State v. Rivera*, 42 Kan. App. 2d 1005, 1010, 219 P.3d 1231 (2009).

The elements instructions for Hillard's first-degree murder and rape charges instructed the jury it had to find the acts occurred in Sedgwick County. In turn, Instruction 50 informed the jury how to determine whether a charged act occurred (or a crime was committed) in a particular county under Kansas law:

> "In considering whether the State has met its burden as to each defendant in relation to Counts 1, 2, and 8, if any alleged crime is committed in any vehicle passing through this state, and it cannot readily be determined in which county the alleged crime was committed, the prosecution may be in any county in this state through which such vehicle has passed or in which such travel commenced or terminated.

> "Further, in considering whether the State has met its burden in relation to Counts 1, 2, & 8, where two or more acts are requisite to the commission of any crime and such acts occur in different counties, the prosecution may be in any county in which any of such acts occur."

Hillard objected to Instruction 50 at trial. He argued the instruction was not factually appropriate because there was no evidence to suggest the rape of S.S. occurred outside of Sedgwick County and the State had argued that Hillard killed Goodpaster by hanging him in Harvey County. The district court overruled the objection, finding the instruction was both legally and factually appropriate.

53

B.  *Standard of Review and Relevant Legal Framework*

Hillard's argument raises two distinct issues—the sufficiency of the evidence supporting venue in Sedgwick County and instructional error. "Venue must be proved to establish the jurisdiction of the court; it is a question of fact to be determined by the jury, albeit the existence of jurisdiction is a question of law, subject to unlimited appellate review." *State v. Hunt*, 285 Kan. 855, 859, 176 P.3d 183 (2008). In evaluating the sufficiency of the evidence supporting a finding of venue in Sedgwick County, we view the venue evidence "'in a light most favorable to the prosecution.'" 285 Kan. at 860. If Hillard's challenge to the venue evidence requires us to interpret relevant Kansas venue statutes, this statutory interpretation raises a "question of law over which appellate courts exercise unlimited review." *State v. Castleberry*, 301 Kan. 170, 175, 339 P.3d 795 (2014). And for any claim of instructional error, we analyze the issue under the four-step process set forth in the previous issue. See *Plummer,* 295 Kan. at 163.

C.  *The Challenged Instructions Were Legally Appropriate*

We first address Hillard's claim that the challenged instructions were not legally appropriate. To be legally appropriate, a jury instruction must fairly and accurately state the applicable law. This presents a question of law over which our review is unlimited. *State v. Dominguez*, 299 Kan. 567, 573-74, 328 P.3d 1094 (2014). And as we explained in the previous issue, we consider the jury instructions together as a whole rather than viewing a single instruction in isolation. *Rogers*, 276 Kan. at 502.

We conclude the jury instructions, viewed together as a whole, fairly and accurately stated the law on venue in this case. The elements instructions for Hillard's charges of first-degree premeditated murder, felony murder, and rape informed the jury

54

that the State needed to prove beyond a reasonable doubt that "the act" occurred in Sedgwick County. This "element" accurately reflects the State's obligation to prove venue as a jurisdictional fact in criminal cases. See *State v. Stevens*, 285 Kan. 307, 325, 172 P.3d 570 (2007), *overruled on other grounds by State v. Ahrens*, 296 Kan. 151, 290 P.3d 629 (2012).

Instruction 50 set forth the relevant Kansas law guiding the jury's decision whether "the act" can be considered to have occurred in Sedgwick County, even if there is some ambiguity as to the county in which that act was completed. The first paragraph of Instruction 50 is patterned after K.S.A. 22-2608:

> "If a crime is committed in, on or against any vehicle or means of conveyance passing through or above this state, and it cannot readily be determined in which county the crime was committed, the prosecution may be in any county in this state through or above which such vehicle or means of conveyance has passed or in which such travel commenced or terminated."

The second paragraph is patterned after K.S.A. 22-2603 which provides: "Where two or more acts are requisite to the commission of any crime and such acts occur in different counties the prosecution may be in any county in which any of such acts occur." Generally, jury instructions patterned after statutes are legally proper. *State v. Carr*, 314 Kan. 615, 658, 502 P.3d 546 (2022).

We have rejected a venue instruction that included language informing jurors where "'the prosecution may be,'" in part, because that language could have confused the jury. *State v. Robinson*, 303 Kan. 11, 284, 363 P.3d 875 (2015), *disapproved of on other grounds by State v. Cheever*, 306 Kan. 760, 402 P.3d 1126 (2017). But we find *Robinson* distinguishable.

55

In *Robinson*, the State prosecuted the defendant for capital murder in Johnson County even though the bodies of two victims were found in a different county. The district court gave a jury instruction to aid jurors in deciding whether venue was proper. But that instruction was modeled after common-law principles for territorial jurisdiction (i.e., which state has jurisdiction over the criminal proceedings), not venue. 303 Kan. at 283 (citing *State v. Grissom*, 251 Kan. 851, 889, 840 P.2d 1142 [1992]). The instruction failed to include any language based on the two statutory venue rules applicable in that case, including K.S.A. 22-2611. That statute governs venue when "the cause of death is inflicted in one county and the death ensues in another county" and imposes a statutory presumption that death occurs in the county where a victim's body is found. *Robinson*, 303 Kan. at 283 (citing K.S.A. 22-2603 and K.S.A. 22-2611). Thus, the jury instruction in *Robinson* abjectly failed to inform the jury of any relevant venue rules.

Unlike *Robinson*, the district court properly instructed Hillard's jury on the relevant venue statutes. The court did not erroneously inform the jury about rules for territorial jurisdiction. And K.S.A. 22-2611 was not germane to the evidence developed at trial or the jury instruction challenges Hillard raised below or on appeal. Moreover, any potential confusion related to the phrase identifying where "the prosecution may be" was cured by reading Instruction 50 along with the relevant elements instructions. We hold that the venue instructions were legally appropriate.

D. *Instruction 50 Was Factually Appropriate and Sufficient Evidence Supports the Jury's Venue Finding*

Having determined the jury instructions were legally appropriate, we turn to whether they were also factually appropriate. To answer this question, we must determine "if there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, to support a factual basis for the instruction. 'Such an inquiry is closely akin to the sufficiency of the evidence review frequently performed by appellate

courts in criminal cases.' [Citations omitted.]" *Dominguez*, 299 Kan. at 573-74. Thus, our assessment of the factual appropriateness of Instruction 50 also determines whether the jury's venue findings are supported by sufficient evidence.

Hillard's challenge to the factual appropriateness of Instruction 50 is based on the State's theory that Hillard killed Goodpaster by hanging him in Harvey County. At trial, the State presented sufficient evidence to support this theory. But the State's evidence also raised the possibility that Goodpaster died in Sedgwick County or somewhere between Sedgwick County and Harvey County as defendants transported Goodpaster (or his body) in Hillard's truck. Bussart testified that three or four minutes after leaving the Hillards' house, while the parties were in route from 1310 S. Meridian Street in Valley Center (a city within Sedgwick County) to Bright's residence, also in Valley Center, he could no longer hear Goodpaster breathing. Bussart believed Goodpaster may have been dead at that point. And Bussart added that he thought Goodpaster was already dead when they dragged him to the creek area in Harvey County. And during Bright's 911 call, he reported that Hillard had just left Bright's residence in a white Chevrolet truck. Based on his conversation with Hillard, Bright reported that Hillard may have just killed someone and was looking for a place to hide the body. Bright also observed what he believed to be a body slumped over in Hillard's truck. While Dr. Distefano concluded that Goodpaster died because of asphyxiation by hanging, he reached this conclusion largely because law enforcement had discovered Goodpaster's body hanging from a tree. Dr. Distefano admitted at trial that Goodpaster could have also died because of the perpetrators positioning of Goodpaster's head and neck in the truck, preventing him from breathing and causing his death.

Together, this evidence and the reasonable inferences drawn from it support a finding that Goodpaster died in the truck while the parties were still within the boundaries of Sedgwick County. In turn, such a finding establishes that venue was proper in

57

Sedgwick County under the general criminal venue statute. See K.S.A. 22-2602 (Generally, "the prosecution shall be in the county where the crime was committed.").

At the same time, this evidence supports a finding that Goodpaster died sometime during the drive from Sedgwick County to Harvey County. Thus, even if there is some uncertainty whether Goodpaster took his final breath before or after defendants had crossed the Sedgwick-Harvey County line, this evidence was sufficient to establish venue in either county. See K.S.A. 22-2608 (where crime committed in vehicle traveling in Kansas and "it cannot readily be determined in which county the crime was committed, the prosecution may be in any county in this state" through which the vehicle has passed). Likewise, this evidence confirms that the first paragraph of Instruction 50, patterned after K.S.A. 22-2608, was factually appropriate.

Alternatively, there was sufficient evidence to support a finding that Hillard killed Goodpaster by hanging him in Harvey County (as the State argued at trial). If the jury adopted this finding in arriving at the verdict, venue was still proper in Sedgwick County under K.S.A. 22-2603, provided that Hillard committed an act requisite to the commission of first-degree murder there, and then committed an act requisite to the commission of murder in Harvey County. When a victim is removed from one county to be murdered in another, "the removal was an act 'requisite' to the commission of the murder" under K.S.A. 22-2603. *State v. Pyle*, 216 Kan. 423, 435, 532 P.2d 1309 (1975).

Here, the trial evidence was sufficient to support a finding that Hillard and his cohorts severely tortured and beat Goodpaster at Hillard's residence in Sedgwick County. Then, they transported Goodpaster to Harvey County, where Bussart helped Hillard hang Goodpaster. If Goodpaster did not die from positional asphyxiation in the truck, Hillard's decision to transport Goodpaster from Sedgwick County was an act requisite to the commission of his murder in Harvey County. Thus, the evidence was sufficient to

support the jury's venue finding under K.S.A. 22-2603. And this evidence also confirms that the second paragraph of Instruction 50, patterned after K.S.A. 22-2603, was factually appropriate.

In sum, the State presented evidence sufficient to support a finding that Goodpaster died while being transported in Hillard's truck, rendering venue in Sedgwick County proper under either K.S.A. 22-2602 or K.S.A. 22-2608. Alternatively, the State presented sufficient evidence to support a finding that Hillard's decision to transport Goodpaster from Sedgwick County was an act requisite to his murder in Harvey County. Thus, venue was also proper in Sedgwick County under K.S.A. 22-2603. We hold that the district court venue instructions were legally and factually appropriate, and the jury's venue findings are supported by legally sufficient evidence.

## V. *The District Court Did Not Err in Limiting Cross-Examination of Two Witnesses*

Next, Hillard argues the district court abused its discretion when it limited cross-examination of S.S. and Bussart on the agreements they purportedly reached with the State in exchange for their testimony.

### A. *Relevant Legal Framework and Standard of Review*

The Sixth Amendment to the United States Constitution guarantees that "the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. IV; see also Kan. Const. Bill of Rights, § 10 (providing a criminal defendant the right "to meet the witness face to face"). "Inherent in the Sixth Amendment's right of confrontation is a criminal defendant's right of cross-examination." *Thomas*, 307 Kan. at 738. But a defendant's right of cross-examination is not absolute, and "[i]n certain circumstances it must 'bow to accommodate other legitimate interests

59

in the criminal trial process.'" 307 Kan. at 738 (quoting *Chambers v. Mississippi*, 410 U.S. 284, 295, 93 S. Ct. 1038, 35 L. Ed. 2d 297 [1973]).

"Because a district court may exercise reasonable control over the scope of cross-examination, appellate courts review the court's decision to limit cross-examination for an abuse of discretion." *Thomas*, 307 Kan. at 739. As the party asserting an abuse of discretion, Hillard bears the burden of proof on this issue. 307 Kan. at 739.

B. *Additional Facts*

During a recess, the district court addressed the permissible scope of examining several witnesses about their plea agreements with the State. The district court ruled that Hillard could question Scott and Bussart about their plea agreements, including what charges they were facing, what charges were dismissed, and whether they might receive a lesser sentence in exchange for their testimony. But it prohibited Hillard from questioning Scott or Bussart about the specific length of any sentence they may be facing.

As for S.S., Hillard's defense counsel felt the State had grounds to charge S.S. with felony murder based on her involvement with the drug deal. Because the State had not charged S.S. with any crime, defense counsel believed there was a "wink wink sorta situation," meaning the State intended to "cut an under the table deal" in exchange for her testimony.

The State did not believe the evidence supported a felony-murder charge against S.S. It also represented to the court that S.S. had never sought immunity or any plea agreement from the State and no such agreement existed. Even so, defense counsel intended to question S.S. about a potential deal with the State to avoid a felony-murder charge. The State argued this line of questioning would be inappropriate without a good-

faith basis for believing such an agreement existed. The district court agreed, ruling that defense counsel could not ask about any unwritten deal *unless* defense counsel could first present a good-faith basis for the inquiry.

C. *The District Court Did Not Abuse Its Discretion in Limiting Hillard's Cross-Examination of S.S.*

Hillard claims the district court abused its discretion in limiting S.S.'s cross-examination. Hillard does not identify any specific error of law or fact related to the district court's ruling, so we presume Hillard believes the district court's decision was objectively unreasonable. But Hillard has failed to carry his burden to show that the district court's limitation on S.S.'s cross-examination was unreasonable.

In reaching this conclusion, we find it significant that the district court did not definitively foreclose all opportunities for Hillard to question S.S. about deals she had made with the State. Instead, it ruled that the defense could not pursue that line of questioning *unless* it established a good-faith basis for believing such a deal existed. This limitation was reasonable because the State vehemently denied the existence of any agreement, and defense counsel provided only speculation to support its existence.

Despite this reasonable limitation on cross-examination, defense counsel explored other lines of questioning to impugn S.S.'s credibility. For example, on cross-examination, S.S. confirmed that during her interview with law enforcement she asked, "[I]s this gonna help me?" Defense counsel also asked S.S. whether she had been charged with any crimes based on her involvement in the drug deal and her active participation in the beating of Goodpaster. S.S. confirmed the State had not charged her with any crimes. Defense counsel also established that S.S. had a prior conviction for falsely reporting a crime of kidnapping and that the false report also alleged a sexual assault. Indeed, even Hillard admits that S.S.'s cross-examination, "left [the jury] with the impression S.S.'s

61

motive to testify was based on her desire to avoid prosecution for a potential drug offense." This was the same impression defense counsel intended to create through the excluded line of questioning.

Hillard compares the district court's ruling to several other cases in which the district court erred by limiting a defendant's cross-examination on the witness' plea agreement. But in the cases cited by Hillard, the witnesses had executed an agreement to cooperate with the government. See, e.g., *Delaware v. Van Arsdall*, 475 U.S. 673, 676, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986) (witness admitted during voir dire that the State had dropped a criminal charge against him in exchange for talking with prosecutor); *United States v. Chandler*, 326 F.3d 210, 216-17 (3d Cir. 2003) (one witness had been sentenced and was testifying under cooperation agreement; another witness had pleaded guilty and was awaiting sentencing); *Hoover v. Maryland*, 714 F.2d 301, 303-04 (4th Cir. 1983) (witness had entered immunity agreement with State). Thus, the defendants in these cases had a good-faith basis to ask about the witnesses' agreements. Hillard's case is distinguishable because there is no reasonable basis to believe S.S. had any agreement (or other informal arrangement) with the State to testify against Hillard.

Hillard also cites *State v. Sharp*, 289 Kan. 72, 96-99, 210 P.3d 590 (2009). There, the defendant's accomplice entered a plea agreement in which the State reduced the charges against the accomplice in exchange for his agreement to testify against the defendant. The defense inquired about the benefits the accomplice would receive under the plea agreement. Defense counsel also sought to establish on cross-examination that the accomplice hoped to receive a dispositional or downward departure, even though the agreement did not commit the State to any position at sentencing. The district court prohibited this inquiry. We held this limitation on the scope of cross-examination was reasonable because the defense was allowed to elicit testimony from the accomplice about the terms memorialized in the plea agreement. 289 Kan. at 99-100.

Hillard asserts the holding in *Sharp* would have been different if the accomplice had not been charged or had not reached a plea agreement. But Hillard's assertion is founded on a misinterpretation of the opinion. The *Sharp* court merely distinguished two out-of-state cases the defendant had cited because in one of the cases, *State v. Mizzell*, 349 S.C. 326, 563 S.E.2d 315 (2002), the witness had not reached a plea agreement. And in the other case, *Boone v. Paderick*, 541 F.2d 447 (4th Cir. 1976), the witness had not been charged. And while Hillard does not cite *Boone*, we note that in that case the record showed police officers had promised the witness he would not be charged if he cooperated with the prosecution. 541 F.2d at 449-51. For these reasons, Hillard fails to establish that the district court's ruling constitutes an abuse of discretion.

D. *The District Court Did Not Abuse Its Discretion in Limiting Hillard's Cross-Examination of Bussart*

Hillard also argues the district court abused its discretion when it prevented defense counsel from questioning Bussart about the exact length of any potential sentences he might be facing. We addressed the same argument in *Hillard¸* finding no abuse of discretion:

> "First, we are unable to divine what legal rule the district court supposedly applied incorrectly in imposing this limitation. Second, we note that the scope of cross-examination permitted by the district court very closely mirrored that in *Sharp*, 289 Kan. at 99. Within that limitation, Jeff's counsel cross-examined Bussart about his plea deal. The jury learned the details of Bussart's plea, learned that Bussart hoped to obtain leniency in exchange for his testimony, and learned that he had not yet been sentenced. While the jury may not have appreciated the precise numerical importance of Bussart's ability to plead guilty to felony murder—and thus face a parole board after only 25 years, instead of 50—they were well aware that his other charges were dropped. Moreover, as in *Sharp*, the district court also gave the jury a cautionary instruction, warning it to 'consider with caution the testimony of an accomplice.' See 289 Kan. at 99-100. Thus, we cannot

63

conclude that no reasonable person would have imposed the same restriction. The district court did not abuse its discretion by placing these limits on Hillard's cross-examination of Bussart." *Hillard*, 313 Kan. at 841-42.

For these reasons, we conclude that Hillard has failed to carry his burden to show the district court abused its discretion in limiting the cross-examination of Bussart.

## VI. *The Evidence Was Sufficient to Support Hillard's Conviction for Rape*

Hillard argues there was insufficient evidence to support his rape conviction.

### A. *Standard of Review and Relevant Legal Framework*

"'When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.'" *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018).

The State prosecuted Hillard for rape under K.S.A. 2016 Supp. 21-5503(a)(1)(A) ("Knowingly engaging in sexual intercourse with a victim who does not consent to the sexual intercourse . . . [w]hen the victim is overcome by force or fear."). "'Sexual intercourse' means any penetration of the female sex organ by a finger, the male sex organ or any object. Any penetration, however slight, is sufficient to constitute sexual intercourse." K.S.A. 2016 Supp. 21-5501(a).

B. *Additional Facts*

Before addressing the merits of this issue, we first summarize the trial evidence relevant to this conviction. S.S. testified that Hillard tased her several times in the genitals while she was bound in the Equinox and she felt the taser enter her vagina. And on the audio recording that captured a portion of Goodpaster's torture, S.S. can be heard saying, "I got tased in the vagina."

Megan Meier, a forensic nurse at Wesley Medical Center, assisted with S.S.'s sexual assault examination in the early morning hours of November 7, 2016. That examination revealed that S.S. had a 5mm by 10mm laceration in the posterior fourchette area of her genitalia, which Meier described as "pretty notable, concerning size." Meier testified that access to the posterior fourchette requires penetration of the female genitalia. She stated that the injury was consistent with blunt force trauma. And while S.S. testified that she had engaged in consensual sex on November 4, Meier had never seen an injury that severe resulting from penile vaginal penetration. Meier said the nurses did not perform a speculum exam at that time because S.S. was in too much pain.

S.S. returned to Wesley Medical Center to complete her sexual assault exam on the morning of November 8, 2016. She was sent to the emergency department because she was still having pain and a nurse had observed some bleeding while examining S.S.'s pelvic area. Dr. Jose Cepeda conducted a full pelvic exam of S.S. He observed the tear in S.S.'s posterior fourchette. He also saw some bleeding but concluded it was menstrual blood.

At trial, Dr. Cepeda explained that thermal injuries, like those inflicted by a taser, typically manifest in two ways. First, the skin is cut, which was present in S.S.'s case. Second, the skin itself is burned, with the severity of the burn depending on how long the

object was in contact with the skin and the intensity of the heat. He said that with thermal injuries, one would generally expect to see some redness or "crusting," depending on how much time had passed since the injury. S.S. did not have any signs of burning, so Dr. Cepeda could not definitively say that her injuries matched her report of being tased. He added, however, that he saw S.S. a day or two after the initial injury, and any inflammation caused by a thermal injury may have healed.

Dr. Cepeda also testified that S.S.'s injury could reflect blunt force trauma. He explained that vaginal mucosa is easily damaged and such damage can occur with consensual sex. He also admitted S.S.'s laceration theoretically could have been caused by inserting a tampon, but he thought that was unlikely given the force necessary to cause such an injury.

C. *S.S.'s Testimony, as Corroborated by Other Evidence, Was Sufficient to Support Hillard's Conviction for Rape*

Even without corroboration, S.S.'s testimony that Hillard penetrated her genitals with a taser while she was bound and blindfolded is sufficient evidence to support his rape conviction if the jury found that testimony credible. See *State v. Race*, 293 Kan. 69, 79, 259 P.3d 707 (2011) (testimony of victim alone sufficient to support rape conviction without further corroboration if evidence is clear and convincing and not so incredible and improbable as to defy belief). And here, the State did provide evidence corroborating her testimony. S.S. had a laceration on her posterior fourchette, which Meier testified could have only been accomplished through penetration of the female genitalia. Medical professionals also testified that her injury resembled blunt force trauma and possibly a thermal injury, and that it was unlikely this injury could have been caused by penile penetration or a tampon. Other evidence more generally corroborated the details of S.S.'s testimony. For example, Scott testified that she had given Heidi a white t-shirt so Heidi

66

could use it to blindfold S.S. Law enforcement later found two knotted white cloths in the backseat of the Equinox, one of which had hair in it. And, of course, the audio recordings of Goodpaster's torture captured S.S. saying she had been tased in the vagina.

Hillard argues that S.S.'s testimony could not be believed because it conflicted with all the other evidence at trial, but this is simply not true. There were reasons to question her credibility. In fact, she had falsely reported that she was a victim of a kidnapping and sexual assault in the past. But these credibility issues alone did not render her testimony "'so incredible and improbable as to defy belief.'" 293 Kan. at 79. And the State put on other evidence to bolster her testimony. Ultimately, the determination of S.S.'s credibility was left to the jury, and we will not disturb that determination on appeal. See *Chandler*, 307 Kan. at 668.

VII. *The Evidence Was Sufficient to Support Hillard's Other Convictions*

Finally, Hillard argues there is insufficient evidence to support his convictions for first-degree premeditated murder, felony murder, the aggravated kidnapping of Goodpaster, and the aggravated kidnapping of S.S. We address the sufficiency of the evidence supporting each of these convictions in turn.

A. *The Evidence Was Sufficient to Support Hillard's Conviction for First-Degree Premeditated Murder*

First-degree premeditated murder is the killing of a human committed intentionally and with premeditation. K.S.A. 2020 Supp. 21-5402(a)(1). To secure Hillard's conviction, the State had to prove he intentionally killed Goodpaster and that the killing was done with premeditation. The State also prosecuted Hillard under an aiding and abetting theory of criminal liability. To secure a conviction under this theory, the State needed to prove Hillard intentionally aided another in committing first-degree

67

premeditated murder. And under an aiding and abetting theory, the State still had to prove Hillard had the specific intent of premeditation to secure a conviction. See K.S.A. 2020 Supp. 21-5210; *Morris*, 311 Kan. at 490; *State v. Soto*, 301 Kan. 969, Syl. ¶ 12, 349 P.3d 1256 (2015).

Hillard mainly argues the State did not present sufficient evidence that he killed Goodpaster with premeditation.

> """Premeditation means to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act. Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life. [Citation omitted.]""" *State v. Moore*, 311 Kan. 1019, 1040, 469 P.3d 648 (2020).

"'[P]remeditation and deliberation may be inferred from the established circumstances of the case, provided the inference is a reasonable one.'" *State v. Carter*, 305 Kan. 139, 152, 380 P.3d 189 (2016). Several factors may be considered when determining whether the evidence gives rise to an inference of premeditation, including """(1) the nature of the weapon used; (2) lack of provocation; (3) the defendant's conduct before and after the killing; (4) threats and declarations of the defendant before and during the occurrence; and (5) the dealing of lethal blows after the deceased was felled and rendered helpless."'" 305 Kan. at 152. Additionally, "'the analysis of what inferences can be reasonably drawn is not driven by the number of factors present in a particular case because in some cases one factor alone may be compelling evidence of premeditation.'" 305 Kan. at 153.

Contrary to Hillard's assertion, the State presented overwhelming evidence of premeditation. Indeed, the evidence establishes at least four of the foregoing factors. First, the State's evidence at trial established that Goodpaster did not provoke Hillard's acts of violence.

Second, Hillard's conduct before and after the killing evidenced deliberation, planning, and adequate time for reflection. Hillard along with his codefendants interrogated, beat, and tortured Goodpaster in the outbuilding for at least 60 to 90 minutes. Hillard even turned on a motorcycle at one point to cover the sounds of Goodpaster's screams. Later, after Goodpaster had tried to escape and Hillard tackled him outside, Hillard procured a rope already tied in a noose from another outbuilding, and the perpetrators used the rope to pull Goodpaster into Hillard's truck. Hillard departed from his residence in the truck along with Bussart and Morris. They stopped at Bright's house, where Hillard asked to stash something and picked up cleaning supplies before driving to rural Harvey County. Sometime during the ride, the three codefendants discussed what to do with Goodpaster's body. Eventually, they found a remote rural area with an unlocked gate. They dragged Goodpaster from the truck to a creek using the rope. Hillard instructed Bussart to put the rope around Goodpaster's neck. Hillard threw the rope over a branch and lifted Goodpaster up. Afterwards, they cleaned out the blood in Hillard's truck and bought clean clothes.

Third, Hillard's threats during the interrogation of Goodpaster provided more direct evidence of premeditation. In the audio recording of that interrogation, Hillard said, "I don't want to kill him yet. We need him to talk still."

Finally, Hillard and his cohorts continued to beat and eventually hanged Goodpaster after he was felled and rendered helpless. After Goodpaster tried to escape, the perpetrators secured him to a chair in the outbuilding with zip ties and continued the

69

violent interrogation. And Goodpaster was incapacitated when the perpetrators hanged him in remote Harvey County.

Viewed in the light most favorable to the State, this evidence was sufficient to support the jury's finding of premeditation and its conviction of Hillard for first-degree premeditated murder. Cf. *State v. Cavaness*, 278 Kan. 469, 480, 101 P.3d 717 (2004) (evidence establishing that perpetrators beat victim unconscious, dealt more blows while victim was helpless, dragged victim inside the residence, discussed the fact they could not let victim leave, procured rope to tie up victim, and cleaned up the blood after the murder was enough to support finding of premeditation); *State v. Doyle*, 272 Kan. 1157, 1162, 38 P.3d 650 (2002) (number of blows inflicted and efforts taken to conceal crime, among other evidence, sufficient to infer premeditation).

Hillard focuses on certain evidence that did not support a finding of premeditation when viewed in isolation. For instance, he notes Bussart testified that when the group left the hotel to go to the Hillards' home, they had not yet formulated a plan to kill Goodpaster. Bussart also testified that someone had mentioned hanging Goodpaster, but Bussart thought it was a joke. Hillard also claims he was provoked because Goodpaster allegedly had a plan to have Heidi's children removed from the home. Hillard's argument requires us to ignore all other evidence supporting a finding of premeditation or reweigh the conflicting evidence relevant to premeditation. Our standard of review forecloses this argument. See *Chandler*, 307 Kan. at 668 (when reviewing the sufficiency of the evidence supporting a conviction, appellate courts view the evidence in the light most favorable to the prosecution; appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make credibility determinations).

While Hillard mainly frames his argument as a challenge to the evidence supporting premeditation, he also claims the State failed to prove he killed Goodpaster. Instead, Hillard contends that Goodpaster's postmortem toxicology results suggest he died of a methamphetamine overdose.

At trial, two experts testified about Goodpaster's postmortem toxicology results. Dr. Distefano testified that the level of methamphetamine in Goodpaster's blood was *potentially* toxic, but he did not think it caused Goodpaster's death. Timothy Rohrig, director of the Sedgwick County Regional Forensic Science Center, assisted with the toxicological analysis. He described the level of methamphetamine in Goodpaster's blood as "low," though he admitted it could potentially be toxic. Still, Rohrig did not believe methamphetamine caused Goodpaster's death because Goodpaster had a higher tolerance for methamphetamine because of his habitual use. And at least six hours had lapsed since Goodpaster last used methamphetamine around 4:15 a.m.

Once again, Hillard's argument fails to consider our standard of review. While Hillard highlights parts of the toxicology analysis in isolation, he ignores all other evidence supporting the jury's finding that Goodpaster was murdered, including the testimony of medical professionals concluding that methamphetamine did not cause Goodpaster's death and that Goodpaster died from asphyxiation by hanging. Viewing this evidence in the light most favorable to the State, a rational fact-finder could find beyond reasonable doubt that Hillard killed Goodpaster intentionally and with premeditation.

B. *We Decline to Reach Hillard's Challenge to the Sufficiency of the Evidence Supporting His Felony-Murder Conviction*

Hillard also argues the evidence could not support his conviction for felony murder. We note, however, that the district court sentenced Hillard for first-degree premeditated murder. It dismissed Hillard's felony-murder conviction but stayed the

71

dismissal pending appeal. Because we affirm Hillard's first-degree premeditated murder conviction, his felony-murder conviction will be dismissed. As a result, we decline to reach the merits of this issue.

C. *The Evidence Was Sufficient to Support Hillard's Convictions for Aggravated Kidnapping*

Next, Hillard argues there was insufficient evidence to support his convictions for the aggravated kidnappings of Goodpaster and S.S.

Kidnapping is defined as "the taking or confining of any person, accomplished by force, threat or deception" with the specific intent to attain one of four statutory objectives. See K.S.A. 2020 Supp. 21-5408(a); *State v. Harris*, 310 Kan. 1026, 1031, 453 P.3d 1172 (2019). The State charged Hillard under K.S.A. 2016 Supp. 21-5408(a)(3), so the State needed to prove beyond a reasonable doubt that Hillard held Goodpaster and S.S. respectively with the intent "to inflict bodily injury or to terrorize the victim or another." And to secure convictions for aggravated kidnapping, the State needed to prove all the elements of kidnapping under K.S.A. 2016 Supp. 21-5408(a)(3) plus the added element that defendant inflicted bodily harm when the victim was kidnapped. See K.S.A. 2016 Supp. 21-5408(b). As with the first-degree premeditated murder charge, the State prosecuted Hillard as a principal and under an aiding and abetting theory of criminal liability. See K.S.A. 2020 Supp. 21-5210(a).

Hillard first argues the evidence could not establish that he took Goodpaster and S.S. from the hotel by force. But the jury was instructed that the State needed to prove that Hillard confined Goodpaster and S.S. only. Thus, even if Hillard's assertion is correct, it does not cast doubt on the sufficiency of the evidence supporting his aggravated kidnapping convictions by means of confinement.

Hillard also argues there was insufficient evidence to show that he held Goodpaster and S.S. with the specific intent to inflict bodily harm or terrorize them. "Specific intent . . . may be shown by acts, circumstances and inferences reasonably deducible therefrom and need not be established by direct proof." *State v. Dubish*, 234 Kan. 708, 717, 675 P.2d 877 (1984).

As for the aggravated kidnapping of Goodpaster, the jury could reasonably infer Hillard confined Goodpaster in the outbuilding with the specific intent to inflict bodily harm or terrorize him. At trial, the State presented evidence that Hillard and his cohorts forcibly restrained Goodpaster in the outbuilding. While Goodpaster was restrained, Hillard interrogated, beat, and tortured Goodpaster. In the audio recording, Goodpaster can be heard screaming in pain, and Hillard can be heard asking questions and making threats. A jury could reasonably infer from this evidence that Hillard confined Goodpaster with the specific intent to inflict bodily harm or to terrorize him.

Even so, Hillard claims that his only intent was to "protect the children," and there was no intent to harm Goodpaster. Hillard bases this argument on his enigmatic statement to Bright that, "It's about the girls." But even if Hillard was motivated to commit the above-described acts for "the girls," that does not mean he lacked the specific intent necessary to support an aggravated kidnapping conviction. An intent to "protect the children" and an intent to inflict bodily harm or terrorize Goodpaster are not mutually exclusive.

Hillard also points out that Dr. Distefano testified that Goodpaster's superficial injuries did not kill Goodpaster. Hillard argues that this testimony shows "there was no intent to hold Goodpaster to kill him or inflict bodily injury or terrorize." But the State did not have to prove Hillard held Goodpaster with the intent to kill him—specific intent

73

to kill is not an element of aggravated kidnapping. And the evidence at trial shows that Hillard and others inflicted Goodpaster's superficial injuries during Goodpaster's confinement. A jury could infer from these circumstances that Goodpaster was confined with the intent to inflict those injuries.

As for the aggravated kidnapping of S.S., the State's evidence shows that both Hillard and Heidi inflicted bodily injury on and terrorized S.S. while she was confined in the Equinox en route from the hotel to the Hillards' residence. S.S. testified that she was bound, blindfolded, choked with a rope, and repeatedly tased while in the car with Heidi and Hillard. She also testified that Hillard tased her in the vagina. And her sexual assault exam revealed a noticeable laceration on her genitalia. In the audio recording capturing portions of the parties' conversation in the Equinox, S.S. says "ow" or "ouch" multiple times. She also says, "This hurts," and "My wrists hurt," and asks Heidi to loosen the bindings on her arms. A reasonable juror could infer from S.S.'s statements and her tone of voice on the audio recording that she was terrified. This evidence supports the jury's finding that Hillard confined S.S. with the intent to inflict bodily harm or terrorize her, or that he had the same intent while he aided Heidi in doing the same.

Finally, Hillard argues there was insufficient evidence to support his rape conviction. Thus, he contends the State failed to prove bodily harm, an essential element of the crime of aggravated kidnapping. Hillard is correct that if the State relies only on a rape to establish the bodily harm element of aggravated kidnapping and the defendant is acquitted of the rape, a conviction for aggravated kidnapping must be reduced to kidnapping. See *State v. Davis*, 275 Kan. 107, 119-20, 61 P.3d 701 (2003). But as already discussed, the State presented sufficient evidence to support Hillard's rape conviction. And the evidence shows Heidi and Hillard repeatedly tased S.S., which supports a finding of bodily injury. See *State v. Mason*, 250 Kan. 393, 397-98, 827 P.2d 748 (1992) (for

74

purposes of aggravated kidnapping, unnecessary acts of violence and those occurring after the initial abduction may constitute bodily harm and injuries need not be substantial).

CONCLUSION

Based on the analysis above, we affirm the district court's ruling on Hillard's motion to suppress and related evidentiary challenges. We hold that the district court's instructions to the jury were factually and legally appropriate. And, except for Hillard's conviction for conspiracy to distribute a controlled substance, we conclude that sufficient evidence supports the jury's verdict. Thus, we reverse Hillard's conviction for conspiracy to distribute a controlled substance and vacate the accompanying sentence. We affirm Hillard's remaining convictions and sentence.

Convictions affirmed in part and reversed in part, and sentence vacated in part.